No. 25-5122

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CITIBANK, N.A., *et al.,*
*Appellants,*

v.

CLIMATE UNITED FUND, *et al.,*
*Appellees.*

_____

**On Appeal from the United States District Court**
**for the District of Columbia**
No. 1:25-cv-00698-TSC
Hon. Tanya S. Chutkan

_____

**STATE BANKS' OPPOSITION TO APPELLANTS'**
**MOTION FOR A STAY PENDING APPEAL**

_____

ROB BONTA
*Attorney General of California*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
JOHN D. ECHEVERRIA
*Supervising Deputy Attorney*
*General*

TERESA A. REED DIPPO*
DIANA L. KIM
  *Deputy Solicitors General*
THEODORE A. MCCOMBS
MEGHAN H. STRONG
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3896
Teresa.ReedDippo@doj.ca.gov
*Counsel of Record*
*(Additional counsel listed on signature page)*

April 22, 2025

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties**

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital;

Power Forward Communities, Inc.; California Infrastructure and Economic

Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency

Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc.

Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his

official capacity as Administrator of the EPA; W.C. McIntosh, in his official

capacity as Acting Deputy Administrator of the EPA; and Citibank, N.A.

**B.    Rulings Under Review**

The rulings under review are an order dated April 15, 2025, and an opinion

dated April 16, 2025, issued by Judge Tanya S. Chutkan and granting a

preliminary injunction in this case.

**C.    Related Cases**

Citibank has also appealed the preliminary injunction entered by the District

Court.  D.C. Cir. No. 25-5123.


Dated:  April 22, 2025

                                          _/s/ Teresa A. Reed Dippo_____

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................1

Statement .......................................................................................................2

    A. Legal and factual background.................................................................2

    B. Proceedings below ...............................................................................6

Argument........................................................................................................8

I.    Preserving the disputed funds at Citibank will not cause EPA
    irreparable harm........................................................................................8

II.   EPA's merits-related arguments are unlikely to succeed on appeal .............11

    A.    The district court correctly concluded that plaintiffs are likely to
        succeed on the merits of their claims ................................................11

    B.    The district court correctly rejected EPA's jurisdictional
        challenges .........................................................................................15

III.  The balance of equities and public interest do not support a stay.................22

Conclusion .....................................................................................................23

# TABLE OF AUTHORITIES

**Page**

CASES

*Armstrong v. Exceptional Child Ctr.*
575 U.S. 320 (2015)........................................................17

*Bowen v. Massachusetts*
487 U.S. 879 (1988)....................................................18, 19

*California v. Dep't of Educ.*
132 F.4th 92 (1st Cir. 2025).......................................20, 21

*Chi. Women in Trades v. Trump*
2025 WL 1114466 (N.D. Ill. Apr. 14, 2025)....................20

*Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*
904 F.3d 1014 (D.C. Cir. 2018)..........................................8

*City & Cnty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ..........................................12

*Crowley Gov't Servs. v. Gen. Servs. Admin.*
38 F.4th 1099 (D.C. Cir. 2022)......................2, 15, 17, 18

*Dep't of Educ. v. California*
145 S. Ct. 966 (2025)..........................................19, 20, 21

*KalshiEX LLC v. Commodity Futures Trading Comm'n*
119 F.4th 58 (D.C. Cir. 2024)........................................8, 10

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Records*
56 F.3d 279 (D.C. Cir. 1995).............................................18

*League of Women Voters v. Newby*
838 F.3d 1 (D.C. Cir. 2016)...............................................23

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*
763 F.2d 1441 (D.C. Cir. 1985)..........................................16

# TABLE OF AUTHORITIES
## (continued)

Page

*Me. Cmty. Health Options v. United States*
590 U.S. 296 (2020) ........................................................... 19

*Mexichem Specialty Resins, Inc. v. EPA*
787 F.3d 544 (D.C. Cir. 2015) ........................................... 10

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto Ins. Co.*
463 U.S. 29 (1983) ............................................................ 14

*New York v. Trump*
2025 WL 1098966 (D.R.I. Apr. 14, 2025) ..................... 20, 21

*Nken v. Holder*
556 U.S. 418 (2009) ........................................................ 8, 22

*Schneider v. Kissinger*
412 F.3d 190 (D.C. Cir. 2005) ........................................... 10

*Spectrum Leasing Corp. v. United States*
764 F.2d 891 (D.C. Cir. 1985) ....................................... 19, 22

*W. Va. Ass'n of Cmty. Health Centers v. Heckler*
734 F.2d 1570 (D.C. Cir. 1984) ......................................... 10

STATUTES

12 U.S.C.
§ 90 ..................................................................................... 3
§ 265 ................................................................................... 3

28 U.S.C. § 1491(a) ............................................................. 15

42 U.S.C.
§ 7434 ............................................................................... 13
§ 7434(a) ....................................................................... 2, 10

Pub. L. No. 117-169, 136 Stat. 1818 .................................... 2

iii

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I
§ 1.................................................................................12
§ 8, cl. 1........................................................................12
§ 9, cl. 7........................................................................12

REGULATIONS

2 C.F.R. § 200.340(a)............................................................15

OTHER AUTHORITIES

Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025) .....................4, 11, 13

Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) ..............................13

Mot. For Stay Pending Appeal, *California v. Dep't of Educ.*
C.A. No. 25-1244 (1st Cir. Mar. 12, 2025) .........................................9

U.S. Dep't of Treasury, Other Programs, *available at*
https://home.treasury.gov/data/other-programs ...................................3

**INTRODUCTION**

This case concerns the Executive Branch's asserted authority to dismantle a program created and funded by Congress and to terminate every grant awarded as part of the program. Applying foundational principles of constitutional and administrative law, the district court preliminarily enjoined EPA from taking such action with respect to the Greenhouse Gas Reduction Fund, by prohibiting EPA from effectuating grant termination letters or otherwise limiting grantees' access to grant funds, and by requiring Citibank to disburse funds to primary and subgrantees and to preserve grant funds in Citibank's accounts.

EPA, but not Citibank, now moves to stay the entirety of the district court's order pending its appeal of the preliminary injunction. The State Banks write to address EPA's request to stay the provisions of the injunction that require Citibank to preserve the funds, and that enjoin EPA from clawing back the funds for other uses while litigation is pending. As the district court observed, these modest provisions "[p]reserve[e] the status quo" and ensure that the disputed funds remain within the "reach" of the court should plaintiffs prevail. Opn. 36.

EPA does not seriously contend that it would suffer irreparable harm if the funds remained at Citibank while the parties litigate this case. That alone is reason to deny the stay as to those provisions. EPA principally argues that district courts lack authority to consider the parties' dispute at all. The district court correctly

1

rejected EPA's argument, which amounts to a categorical rule that any dispute involving grants must be heard in the Court of Federal Claims. This Court has rejected that understanding of the Tucker Act, explaining that "the mere existence of contract-related issues" is insufficient to deprive the district courts of jurisdiction. *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1109-1110 (D.C. Cir. 2022). And in this case, the subgrantee State Banks are not parties to any contracts with EPA, and all of the plaintiffs present the sort of constitutional and statutory claims that district courts routinely consider. The amended motion for a stay pending appeal should be denied.

## STATEMENT

### A. Legal and Factual Background

1. Congress in 2022 enacted the Inflation Reduction Act, which amended the Clean Air Act to create the Greenhouse Gas Reduction Fund. Opn. 3 (citing Pub. L. No. 117-169, 136 Stat. 1818). Congress appropriated approximately $27 billion to that fund to make grants available for a network of lenders, known as "green banks," to finance climate and clean energy projects across the Nation. *Id.* Congress directed EPA "to make grants" to eligible recipients within 180 days and through September 30, 2024. 42 U.S.C. § 7434(a)(1)-(3).

EPA launched three grant programs to implement the fund, including the National Clean Investment Fund (NCIF). Opn. 3. That $14 billion fund provides

grants to three primary recipients: Climate United Fund, Coalition for Green

Capital, and Power Forward. *Id.* at 3-4. Those grantees provide financing to

subgrantees, which in turn fund clean technology projects nationwide. *Id.* at 1.

The awards are governed by grant agreements executed between the primary

recipient and EPA, which specify certain narrow circumstances under which EPA

may terminate an award. *Id.* at 4-5.

EPA awarded one recipient, the Coalition for Green Capital, $5 billion for

grants to subgrantees and use on other qualified projects. Opn. 4. Each of the

State Banks in this case is a subrecipient of the Coalition's grant. *Id.*[1] Those

subgrants are governed by agreements executed between the Coalition and each

individual State Bank. *E.g.*, D. Ct. Dkt. 17-5 at 3 (Wu Decl.).[2]

Pursuant to statute (*see* 12 U.S.C. §§ 90, 265), NCIF funds are held for the

U.S. Department of Treasury by Citibank under a "financial agency agreement"

between them. Opn. 6.[3] Under that agreement, Citibank is "authorized to act as a

---

[1] The State Banks are the California Infrastructure and Economic Development
Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate
Innovation Finance Authority.

[2] "D. Ct. Dkt." refers to the lead docket, No. 25-cv-820-TSC, in the consolidated
proceedings below.

[3] Financial agency agreements have been implemented under both Republican and
Democratic administrations. For example, the Treasury Department used financial
agency agreements to manage the distribution of loans to the airline industry in
2020. *See* U.S. Dep't of Treasury, Other Programs, *available at*
https://home.treasury.gov/data/other-programs (last visited Apr. 21, 2025).

financial agent of the United States" and provides financial services related to the program.  *Id.*  A primary recipient's program funds are governed by an account control agreement executed among Citibank, EPA, and the primary grantee.  *Id.*  Under that agreement, Citibank must release funds to the grantee upon request, unless EPA issues a "Notice of Exclusive Control" stating that it is exercising its right to exclusive control over an account.  *Id.* at 7.

Subgrantee funds are also governed by an account control agreement among the subgrantee, the primary grantee, and Citibank, but (unlike with primary grantees) EPA is not a party to the agreement and has no rights to assert control over subgrantee accounts.  *See* D. Ct. Dkt. 1 at 14-17 (Compl.).  Citibank is not authorized to restrict access to a subgrantee's account unless the primary grantee issues a Notice of Exclusive Control to Citibank or a court issues a final order restricting access.  *Id.*

2. On January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal," including programs established under the Inflation Reduction Act.  Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025).  He directed "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act," and ordered that "[n]o" such funds "shall be disbursed by a given agency until the

Director of the OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with" their review. *Id.*

Administrator Zeldin subsequently made a series of public statements disparaging the Greenhouse Gas Reduction Fund and calling for termination of the financial agency agreement with Citibank governing the funds. Opn. 8. He stated that the financial agency agreement should be "instantly terminated"; that Citibank must "immediately return the funding"; and that EPA is "not going to rest" until it has clawed back the funds. *Id.* He separately expressed that the "entire scheme" was "criminal," and that the grant programs had been "purposefully designed to obligate all of the money in a rush job with reduced oversight." Opn. 8; Compl. 21. Administrator Zeldin later announced that EPA intended to take control of grant funds disbursed under the Inflation Reduction Act. Opn. 8.

On February 17, 2025, the FBI sent letters to Citibank "recommend[ing]" a 30-day administrative freeze on NCIF funds. Opn. 7. Citibank froze NCIF accounts, including plaintiffs' accounts, and the funds have been inaccessible for drawdowns. *Id.*

The Treasury Department formally instructed Citibank to halt disbursements of any Greenhouse Gas Reduction Funds on March 10. Opn. 7-8. A day later, EPA sent each of the primary NCIF grantees a letter purporting to terminate their awards effective immediately. *Id.* at 9. The letters informed recipients that their

grants had been terminated based on "concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.* The letters also expressed EPA's view that the grant award process presents "potential violations of the Constitution." D. Ct. Dkt. 17-3 at 66 (Strong Decl.). The letters concluded that EPA would "re-obligate" funds from the Greenhouse Gas Reduction Fund in "the coming months." *Id.* EPA terminated "all" grants comprising the NCIF program. Opn. 30.

### B. Proceedings Below

The three primary NCIF grantees filed suit in March 2025, asserting constitutional and Administrative Procedure Act (APA) claims. Opn. 9-10. The district court issued a TRO prohibiting defendants from giving effect to the termination letters and from transferring grant funds from Citibank accounts to EPA. *Id.* at 10.

The plaintiff State Banks also filed suit. Opn. 9. The complaint alleges that EPA's actions to dismantle the Greenhouse Gas Reduction Fund by freezing or terminating plaintiffs' access to federal funds violate the Inflation Reduction Act and the Impoundment Control Act; are unconstitutional in violation of the separation of powers; are arbitrary and capricious in violation of the APA; and are contrary to federal regulations applicable to federal funding awards. Compl. 32-49. The complaint also alleges several contract-based claims against Citibank, but

asserts no contract claims against EPA. *Id.* at 49-52. Plaintiffs requested a declaration that EPA's actions were unlawful; vacatur of the agency's actions; and an injunction preventing EPA from instructing to Citibank to freeze, withhold, or transfer NCIF funds. *Id.* at 53-54.

The district court granted a preliminary injunction. Ord. 1-3. It prohibited the federal defendants from carrying out the termination notices, "unlawfully suspending or terminating" the primary grantees' grant awards or limiting access to the subgrantees' funds, or causing Citibank to limit grantees' fund access. *Id.* at 1-2. The court also ordered Citibank not to transfer or move funds out of the NCIF accounts, *id.*; and, as amended, to disburse "any funds properly incurred since the mid-February suspension of Plaintiffs' funds." D. Ct. Dkt. 96 at 4.

EPA filed a notice of appeal and an amended emergency motion for a stay pending appeal. Citibank also filed a notice of appeal. On April 16, this Court administratively stayed the portion of the injunction that "enables or requires Citibank to release, disburse, transfer, or otherwise move, or allow access to funds." The Court further ordered that no party may "take any action, directly or indirectly, with regard to the disputed contracts, grants, awards or funds."[4]

---

[4] In response to the administrative stay order, State Banks have ceased certain activities related to their implementation of the NCIF program. State Banks request clarification that the order does not prohibit such implementation activities, which do not disturb the NCIF funds held in their Citibank accounts.

**ARGUMENT**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). The stay applicant bears the burden of establishing that (1) it "is likely to succeed on the merits"; (2) it will be "irreparably injured" before the appeal concludes; (3) issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).

State Banks address the aspects of EPA's motion that seek to stay the parts of the injunction that would preserve the disputed funds at Citibank. *Supra* pp. 1, 7. Citibank itself has not moved to stay the injunction prohibiting it from "transferring or otherwise moving" the disputed funds. *See* Citibank Resp. And EPA does not address its authority to move to stay the portions of the injunction that run to Citibank. In any event, EPA has not justified a stay pending appeal of the injunction to preserve funds at Citibank.

## I. PRESERVING THE DISPUTED FUNDS AT CITIBANK WILL NOT CAUSE EPA IRREPARABLE HARM

A failure to demonstrate irreparable harm is "fatal" to a stay request "because a showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n,* 119 F.4th 58, 64 (D.C. Cir. 2024). EPA fails to meet that requirement, and its motion to stay the portions

of the preliminary injunction preserving the disputed funds at Citibank may be denied on that basis alone.

EPA's irreparable harm argument addresses the injunction's order for Citibank to disburse funds. Mot. 10-13. Its contentions do not bear on other provisions of the injunction which prevent EPA from transferring the disputed funds out of plaintiffs' Citibank accounts. These portions of the injunction simply maintain the status quo. *See* Opn. 36.

Preserving the disputed funds at Citibank during litigation causes no harm to EPA, let alone irreparable harm. It poses no risk to EPA's "ability to recover the funds" if it prevails on appeal. *Contra* Mot. 11. To the contrary, it ensures that the disputed funds will be available to whichever party prevails at the end of this litigation. In *Department of Education*, the federal government itself proposed a similar remedy as a "less onerous option[] to preserve the status quo," suggesting in its stay motion that the court could issue "an order to hold the funds without re-obligating them to other uses pending the outcome of the litigation." Mot. for Stay Pending Appeal, *California v. Dep't of Educ.*, C.A. No. 25-1244 (1st Cir. Mar. 12, 2025).

EPA makes no meaningful attempt to explain why the same remedy would cause it irreparable harm here. In a single sentence, EPA gestures at the need to redirect the funds to serve "agency priorities" and the possibility of lost interest.

Mot. 12.  But it fails to explain why those are cognizable harms caused by the preliminary injunction or, even if they were, why they would be irreparable.  *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.").

Even those speculative harms are illusory.  First, EPA provides no concrete information about any agency priorities purportedly thwarted by the injunction, as well as no grounds for restructuring the program or re-obligating any funds.  Mot. 12.[5]  Such vague generalizations are insufficient to establish irreparable harm, which "must be 'both certain and great,' and 'actual and not theoretical.'"  *KalshiEX*, 119 F.4th at 64.  Second, before this lawsuit, EPA had already disbursed the funds at issue to Citibank under the Act (*e.g.*, Opn. 37), so it cannot plausibly claim to be harmed by the loss of interest.  Regardless, EPA fails to explain why any such "purely financial or economic" loss would be irreparable.  *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

---

[5] For instance, this court's precedent generally holds that agency funds "become unavailable" for reallocation "on the last day of the period for which the funds were obligated," which has already passed.  *W. Va. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d 1570, 1577 (D.C. Cir. 1984); 42 U.S.C. § 7434(a)(1)-(3) (setting Sept. 30, 2024 disbursement deadline).

Tellingly, EPA's claim of irreparable harm is refuted by its own experience under the TRO. The provisions in the preliminary injunction preventing defendants from terminating plaintiffs' grants or transferring funds out of Citibank mirror the relief entered by the TRO on March 18, 2025. EPA has thus already been subject to these conditions for a month, yet it fails to identify any evidence of harm suffered during that time.

## II. EPA'S MERITS-RELATED ARGUMENTS ARE UNLIKELY TO SUCCEED ON APPEAL

### A. The District Court Correctly Concluded That Plaintiffs Are Likely To Succeed On The Merits Of Their Claims

The district court also correctly concluded that EPA's effort "to effectively unilaterally dismantle a program that Congress established" is likely unlawful and unconstitutional. Opn. 31.

As the district court recognized, this dispute does not involve a challenge to some "individualized assessment of the grants" or EPA's decision "to terminate them on an individual basis." Opn. 30. Rather, following President Trump's instruction to "[t]erminat[e] the Green New Deal," EPA set out to categorically undo Congress's creation of the Greenhouse Gas Reduction Fund. Exec. Order 14154, 90 Fed. Reg. 8, 353, 8,357 (Jan. 20, 2025). EPA first directed Citibank to freeze all NCIF funds, without distinguishing between grantees. Opn. 7. And it

ultimately terminated the awards of all NCIF grantees using identical termination letters.  Opn. 2.

As detailed above, the Administrator's statements and the language in the letters confirm that this blanket cancellation of the program was based on policy disagreements with the entire congressionally-authorized "scheme," not on any misconduct or noncompliance of individual grantees.  Opn. 8; *see* Opn. 30-31; *supra* pp. 4-6.  Indeed, the termination letters cited generic "concerns regarding *program* integrity, the award *process*, *programmatic* fraud, waste, and abuse, and misalignment with the Agency's priorities."  Opn. 9 (emphases added).  And EPA confirms (Mot. 7) that its core concern lay with the "program's creation and implementation."  This campaign to dismantle the Greenhouse Gas Reduction Fund is unlawful for several reasons.

First, EPA's dismantling of the Inflation Reduction Act is unconstitutional. Opn. 30.  It violates the separation of powers by attempting to override Congress's Article I authority over "[a]ll Legislative powers," including in the Spending and Appropriations Clauses.  U.S. Const. art. I, § 1; *id.*, § 8, cl. 1; *id.*, § 9, cl. 7.  It is axiomatic that the Constitution "exclusively" grants the power to legislate, including "the power of the purse," to Congress, not executive agencies.  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  By enacting the Inflation Reduction Act, Congress duly exercised that power to create

the Greenhouse Gas Reduction Fund and to appropriate the funds at issue for the making of qualifying grants. The NCIF program executes that legislation, and EPA's obligation to "make grants" to support green banks is rooted in statute. 42 U.S.C. § 7434. Many features of the program to which EPA objects—the use of a financial agent, the timeline for disbursement, and the funding of green banks—are specified by Congress's design of the Greenhouse Gas Reduction Fund. *Id.*; Compl. 44. EPA's blanket cancellation of all NCIF grants usurps Congress's legislative power. Although EPA may now disagree with Congress's policy objectives for funding climate-related projects or its choices in structuring the program, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013).

EPA's post-hoc claim (at 20) that it intends to re-obligate the funds is belied by President Trump's express intent to "[t]erminat[e]" the program, 90 Fed. Reg. at 8,357, and Administrator Zeldin's statement after the TRO issued that he would "not rest until these hard-earned taxpayer dollars are returned to the U.S. Treasury."[6] In fact, the district court declined to accept EPA's representations, concluding on "the record" that "EPA suspended all eight grants comprising the

_____

[6] Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM), https://x.com/epaleezeldin/status/1902198769505956089 (emphasis omitted).

entire NCIF and CCIA programs," and that its "public statements contradict" its "representations" in litigation "regarding the future of the program." Opn. 30-31. In any event, EPA offers no basis for its authority to retrieve funds from Citibank and re-obligate them in some restructured program. *See supra* p. 10 n.5; Opn. 31 n.8.

Second, EPA's actions violate the APA's requirement that an agency must provide adequate reasons for its actions and "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). EPA initially caused Citibank to freeze NCIF funds, but provided "no explanation," "despite repeated inquiries." Opn. 27. As the district court observed, "EPA failed to set forth the reasons for its decision because it did not say *anything* about its decision, for weeks." *Id.* When EPA finally did communicate in writing to the grantees, its termination letters "provided no individualized reasoning" and instead "referenc[ed] generalized and unsubstantiated reasons for termination." *Id.* at 28. Even when the district court gave EPA an opportunity to explain the basis of the terminations, EPA provided "no rational explanation" for "why it needed to cancel *every single grant* to review *some* aspects of the [funding] program with which it was concerned." *Id.*

The district court also properly rejected EPA's effort to justify its actions under the "relevant rules and regulation." Opn. 29. Federal regulations only

authorize EPA to terminate grant agreements under four specified conditions.  *See* 2 C.F.R. § 200.340(a)(1)-(4).  None of those conditions exist here, Opn. 29:  EPA has never claimed non-compliance; the grantees object to termination; and EPA admits that the grant agreements do not authorize "termination based on the agency's policy priorities," Mot. 6.  EPA thus "def[ied] the plain language of the regulations that govern its decision-making" when it dismantled the NCIF program and terminated the grants.  Opn. 29.

## B. The District Court Correctly Rejected EPA's Jurisdictional Challenges

EPA's primary argument focuses not on the underlying merits of plaintiffs' claims, but on which court should hear the case.  Mot. 13-21.  The district court correctly concluded that it had jurisdiction because plaintiffs' claims do not fall under the Tucker Act.  Opn. 16-23.

### 1. The Claims Are Not Contractual In Essence

The Tucker Act vests the Court of Federal Claims with jurisdiction over certain lawsuits based on an "express or implied contract with the United States." 28 U.S.C. § 1491(a).  When assessing whether a claim belongs in the Court of Federal Claims, this Court asks whether the claim "is *at its essence* a contract claim," which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Crowley*

*Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). Both

factors here establish that plaintiffs' claims are not in essence contract claims.

*First*, as explained above, the source of plaintiffs' rights is the U.S.

Constitution, the Inflation Reduction Act, the APA, and federal regulations. While

plaintiffs' "claims arise under a federal grant program," they "turn on the

interpretation of statutes and regulations rather than on the interpretation of an

agreement negotiated by the parties." *Md. Dep't of Hum. Res. v. Dep't of Health

& Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985). The case presents the

question of whether EPA exceeded its constitutional and statutory authority when

it attempted to undo the Greenhouse Gas Reduction Fund. It does not present the

kinds of contract interpretation and compliance questions that form the core of

cases litigated under the Tucker Act. The Court of Federal Claims thus has no

"special expertise" in this case, and "[i]t would be nothing less than remarkable to

conclude that Congress intended judicial review of these complex questions" to be

confined to that "specialized forum." *Bowen v. Massachusetts*, 487 U.S. 879, 908

(1988).

In arguing otherwise, EPA misconstrues the nature of plaintiffs' claims. The

"linchpin" of the case (Mot. 15) is not the grant agreements' restrictive termination

provision. To the contrary, EPA's dismantling of the Greenhouse Gas Reduction

Fund violates the constitutional separation of powers, regardless of any contractual

16

terms. Tellingly, EPA does not argue that the district court would lack jurisdiction over these constitutional claims. *See* Mot. 20 (recognizing that the district court's constitutional holding "avoid[s] th[e] problem" of depending on contractual terms). EPA's argument based on the APA's limited waiver of jurisdiction, even assuming it were correct, does not purport to deprive the court of jurisdiction over claims not brought under the APA. *See Crowley*, 38 F.4th at 1106 (Tucker Act "impliedly forbid[s] contract claims against the Government from being brought in district court *under the waiver in the APA*") (emphasis added) (internal quotation marks omitted); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing courts' equity jurisdiction "to enjoin unconstitutional actions by state and federal officers").

In any event, EPA's APA-based arguments are not correct. Plaintiffs' APA claims turn on EPA's failure to comply with statutory and regulatory requirements, which exist independent of any of the grant agreements' terms. Indeed, EPA itself acknowledges (at 4) that the State Banks are not parties to any grant agreement with EPA. *See Crowley*, 38 F.4th at 1110. Moreover, even if some federal regulations were incorporated into the contracts, *see* Opn. 18, "[i]t cannot be that the contract's authority trumps the agency's formal regulations and a federal statute." *Id.* This Court "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the

contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107; *see also id.* at 1109-1110; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

*Second*, the relief plaintiffs seek is neither "monetary damages" nor specific performance. *Crowley*, 38 F.4th at 1107. The State Banks seek declaratory and injunctive relief vacating the agency's actions to scuttle the Greenhouse Gas Reduction Fund program and barring EPA from interfering with Citibank's proper administration of State Banks' accounts. Although injunctive relief may indirectly generate pecuniary benefits, "[a] plaintiff does not 'in essence' seek monetary relief … merely because he or she hints at some interest in a monetary reward from the federal government." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

In *Bowen*, for example, the Supreme Court held that an order barring the government from disallowing reimbursement on a particular basis was not money damages. 487 U.S. at 909. Although the order would "likely" lead to payment of the disputed sum, that was "a mere by-product of [the] court's primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 910. Damages, in contrast, are "compensatory" in nature, designed to "substitute for a suffered loss."

*Id.* at 895 (emphasis omitted).  Like the plaintiff in *Bowen*, plaintiffs do not seek

"specific sums already calculated, past due, and designed to compensate for

completed labors" because they do not grieve past losses.  *Me. Cmty. Health

Options v. United States*, 590 U.S. 296, 327 (2020).  They seek "prospective,

nonmonetary relief to clarify future obligations," and any monetary benefit is a by-

product of enjoining EPA's ongoing constitutional and statutory violations.  *Id.*

This distinction is significant because plaintiffs could not obtain the

injunctive relief they seek if forced to file their claims in the Court of Federal

Claims.  That court "does not have the general equitable powers of a district court

to grant prospective relief."  *Bowen*, 487 U.S. at 905.  Even if the Court of Federal

Claims awarded plaintiffs "a naked money judgment against the United States,"

that would not "be an adequate substitute for prospective relief" addressing the

"ongoing relationship" between grant recipients and EPA.  *Id.*  EPA suggests that

deficiency is intentional (Mot. 21), but it cannot be that parties are left with no way

to stop the government from violating the Constitution and federal law.

### 2. EPA's Reliance on *Department of Education* and *Spectrum* Is Misplaced

Neither *Department of Education v. California*, 145 S. Ct. 966 (2025), nor

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), counsels

otherwise.  *Department of Education* acknowledged *Bowen*'s holding that "a

district court's jurisdiction 'is not barred by the possibility' that an order setting

aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968. It stated only that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* Far from announcing a categorical rule requiring all cases involving grant programs to go to the Court of Federal Claims, the brief per curiam opinion offered a preliminary assessment of the specific TRO before it. Other courts have thus correctly recognized that the emergency ruling does not compel a stay on different facts. *E.g.*, *Chi. Women in Trades v. Trump*, 2025 WL 1114466, at *9-10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, 2025 WL 1098966, at *1-3 (D.R.I. Apr. 14, 2025).

This case differs from *Department of Education* in significant ways.

*First*, the plaintiffs in *Department of Education* raised no constitutional claims. *See California v. Dep't of Educ.*, 132 F.4th 92, 96-100 (1st Cir. 2025). Like EPA's motion, the per curiam opinion is thus limited to the issue of "jurisdiction to order the payment of money under the APA" and does not apply to plaintiffs' constitutional claims here. *Dep't of Educ.*, 145 S. Ct. at 968; *see Chi. Women in Trades*, 2025 WL 1114466, at *9-10 (distinguishing *Department of Education* on this ground).

*Second*, in *Department of Education*, the First Circuit observed that "the terms and conditions of each individual grant award are at issue," and the parties

debated the significance of that fact for purposes of the Tucker Act. 132 F.4th at 96-97. But the terms of the grant awards are *not* at issue here. As the district court recognized, "EPA concedes [the terminations] had nothing to do with Plaintiffs' performance under the grant." Opn. 17. The "categorical funding freeze" and termination of all grants "was not based on individualized assessments of any particular grant terms and conditions," but on EPA's programmatic disagreement with the Greenhouse Gas Reduction Fund. *See New York*, 2025 WL 1098966, at *2 (distinguishing *Department of Education* on this ground). Thus, plaintiffs ask the court to stop EPA from dismantling the congressionally authorized program, not to "enforce a contractual obligation." *Dep't of Educ.*, 145 S. Ct. at 969.

*Third*, the injunctive relief sought in the two cases differs. In *Department of Education*, the TRO "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Dep't of Educ.*, 145 S. Ct. at 968. But here, the injunction would not order EPA "'to pay money.'" *Contra id.* EPA has already disbursed the funds, which are now at Citibank in accounts associated with plaintiffs' grants. Compl. 14.

EPA's reliance on *Spectrum* fails for similar reasons. There, the plaintiff sought "an injunction requiring the government to pay monies owed for computer hardware," and its claims "arose only upon creation and satisfaction of its contract with the government; in no sense did it exist independently of that contract."

*Spectrum Leasing*, 764 F.2d at 894. There was no categorical policy decision at issue, and the plaintiff raised no constitutional challenges to the government's authority to a contested action. The only statute plaintiff cited, the Debt Collection Act, conferred no independent rights absent the contract and "in no way create[d] the substantive right to the remedy" sought. *Id.*

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT A STAY

Finally, EPA failed to establish that the balance of equities and the public interest favor a stay of the portions of the order preserving NCIF funds at Citibank. On the contrary, the district court correctly determined that these factors support preliminary relief because a stay will "substantially injure the other parties interested in the proceeding," *Nken*, 556 U.S. at 426; *see* Opn. 32-38.

As the district court recognized, "[a]ny transfer, re-allocation, or re-obligation of these funds" by EPA would introduce serious uncertainty about the court's ability to award complete relief at the end of the case. Opn. 33, 36; *see also id.* at 33 ("in cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief'"). Nonetheless, EPA contends (at 12) that even if a stay is granted and "[i]f the district court's injunction is upheld on appeal, plaintiffs will receive the funds they claim entitlement to." But they assert elsewhere that they intend to "re-obligat[e] the funds." *Id.* at 3. EPA offers no reason to think that, if it did claw back funds

and attempt to re-obligate them, they would later be available as part of plaintiffs' relief. *Supra* p. 10 n.5.

In contrast, the portions of the preliminary injunction that require EPA to preserve "funds already in" the NCIF accounts merely asks that "funds that have been appropriated by Congress and obligated prior to this suit" stay where they are while the court considers the merits of plaintiffs' claims. Opn. 37; *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'").

## CONCLUSION

The motion for a stay pending appeal should be denied.

Dated: April 22, 2025

Respectfully submitted,

*/s/ Teresa A. Reed Dippo*

KEITH ELLISON
*Attorney General of Minnesota*
PETER N. SURDO
*Special Assistant Attorney General*
OLIVER LARSON
*Manager, Environment and Natural Resources Division*
CATHERINE RIOS-KEATING
*Special Assistant Attorney General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
(651) 757-1061
peter.surdo@ag.state.mn.us
*Counsel for Minnesota Climate Innovation Finance Authority*

ROB BONTA
*Attorney General of California*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
TERESA A. REED DIPPO
DIANA L. KIM
*Deputy Solicitors General*
JOHN D. ECHEVERRIA
*Supervising Deputy Attorney General*
THEODORE A. MCCOMBS
MEGHAN H. STRONG
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3896
teresa.reeddippo@doj.ca.gov
*Counsel for California Infrastructure and Economic Development Bank*

KWAME RAOUL
*Attorney General of Illinois*
JANE ELINOR NOTZ
*Solicitor General*
ALEX HEMMER
*Deputy Solicitor General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov
*Counsel for Illinois Finance Authority*

AARON M. FREY
*Attorney General of Maine*
EMMA AKRAWI
SCOTT W. BOAK
*Assistant Attorneys General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
emma.akrawi@maine.gov
*Counsel for Efficiency Maine Trust*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B). From Introduction through Conclusion, this brief contains 5077 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6). It is set in 14-point Times New Roman, a proportionally spaced typeface.

Dated: April 22, 2025 _____ */s/ Teresa A. Reed Dippo* _____

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated:  April 22, 2025          */s/ Teresa A. Reed Dippo*