# United States Court of Appeals
## for the
## District of Columbia Circuit

_____

CLIMATE UNITED FUND,
COALITION FOR GREEN CAPITAL,
POWER FORWARD COMMUNITIES, INC.,
CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST,
ILLINOIS FINANCE AUTHORITY, MINNESOTA CLIMATE INNOVATION
FINANCE AUTHORITY, JUSTICE CLIMATE FUND, and INCLUSIV, INC.
*Plaintiffs-Appellees*

v.

CITIBANK, N.A.,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, and WILLIAM CHARLES
MCINTOSH, in his official capacity as ACTING DEPUTY ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Defendants-Appellants*

_____

From the United States District Court for the District of Columbia
Case Nos. 1:25-cv-00698-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00735-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00762-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00820-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00938-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00948-TSC (Hon. Tanya S. Chutkan)

_____

**APPELLEES' ANSWERING BRIEF**

_____

Vincent Levy
  *Counsel of Record*
Kevin D. Benish
Daniel Fahrenthold
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellee Coalition for Green Capital*

Beth C. Neitzel
  *Counsel of Record*
Jack C. Smith
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel.: (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw
James M. Gross
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee Power Forward Communities*

Adam G. Unikowsky
  *Counsel of Record*
Kathryn L. Wynbrandt
David B. Robbins
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com

Allison N. Douglis
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff-Appellee Climate United Fund*

Jay C. Johnson
  *Counsel of Record*
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 2001
Tel: (202) 344-4000
jcjohnson@venable.com

*Attorney for Plaintiff-Appellee Inclusiv, Inc.*

David J. Zimmer
  *Counsel of Record*
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Attorneys for Plaintiff-Appellee Justice Climate Fund*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in Appellants' Opening Brief, Doc. 2114428.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Climate United Fund is a wholly controlled subsidiary of Calvert Impact, Inc. No publicly held company owns 10% or more of Climate United Fund.

None of Coalition for Green Capital; Power Forward Communities, Inc.; Justice Climate Fund; or Inclusiv, Inc. has a parent corporation, and no publicly held company owns 10% or more of their stock.

## B. Rulings Under Review

References to the rulings at issue appear in Appellant's Opening Brief, Doc. 2114428.

## C. Related Cases

There are no related cases.

/s/ *Vincent Levy*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY OF TERMS ......................................................................x

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE................................................................2

    A. The Inflation Reduction Act's Greenhouse Gas Reduction Fund..................2

    B. EPA Selects the NCIF and CCIA Plaintiffs to Receive Grants. .....................3

    C. The NCIF and CCIA Plaintiffs Enter Into Account Control Agreements with EPA and Citibank................................................6

    D. The Administration Freezes Plaintiffs' Funds................................9

    E. The District Court Enters a Preliminary Injunction. ....................12

SUMMARY OF THE ARGUMENT .....................................................14

ARGUMENT ....................................................................................17

I.  The Court Should Affirm The Preliminary Injunction Against EPA.................17

    A. The District Court Has Subject-Matter Jurisdiction......................17

        1. Plaintiffs Seek An Order Prohibiting EPA's Interference, Not An Order Enforcing A Contractual Debt For Money. ....................17

        2. No Waiver of Immunity Is Needed, As Sovereign Immunity Does Not Apply In The First Place. .................................20

        3. Congress Waived Any Sovereign Immunity In The APA. .....................25

    B. Plaintiffs Are Likely To Succeed On The Merits...........................35

        1. The IRA and The Constitution. .............................................35

        2. Arbitrary-And-Capricious Action and Agency Regulations...................41

    C. Plaintiffs Have Shown Irreparable Harm Absent An Injunction. .................45

    D. The Balance Of Equities And Public Interest Favor Plaintiffs. ....................49

II. The Court Should Affirm The Preliminary Injunction Against Citibank. .........51

    A. Plaintiffs Are Likely to Succeed on Their Claim Against Citibank..............51

    B. Citibank's Sovereign-Immunity Defense Fails. ...........................................54

CONCLUSION ........................................................................................................56

# TABLE OF AUTHORITIES[*]

**Cases**                                                                      **Page(s)**

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ................................................................................21

*Amerijet Int'l v. Pistole*,
   753 F.3d 1343, 1350 (D.C. Cir. 2014) ................................................42

*Ariz. Grocery Co. v. Atchison, T. & S.F. Ry. Co.*,
   284 U.S. 370, 390 (1932) ....................................................................24

*Armour & Co. v. Freeman*,
   304 F.2d 404 (D.C. Cir. 1962)..............................................................46

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ............................................................................21

*Atlas Air, Inc. v. International Bhd. of Teamsters*,
   928 F.3d 1102 (D.C. Cir. 2019)............................................................46

*Bowen v. Am. Hosp. Ass'n*,
   476 U.S. 610 (1986) ............................................................................44

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ..................................................................... 26, 34

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)...................................................... 21, 22

*City of Houston v. HUD*,
   24 F.3d 1421 (D.C. Cir. 1994)..............................................................38

*City of Kansas City v. HUD*,
   923 F.2d 188 (D.C. Cir. 1991)...................................................31, 42, 45

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Crowley Gov't Servs., Inc. v. GSA*,
 38 F.4th 1099 (D.C. Cir. 2022) ..............................................32

*Dart v. United States*,
 848 F.2d 217 (D.C. Cir. 1988)................................................21

*Dep't of Educ. v. California*,
 145 S.Ct. 966 (2025) ............................................... 17, 16, 34

*Dep't of Navy v. FLRA*,
 665 F.3d 1339 (D.C. Cir. 2012)..............................................36

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
 145 S.Ct. 753 (2025) ............................................................20

*Edelman v. Jordan*,
 415 U.S. 651 (1974) .............................................................20

*Envt'l Health Tr. v. FCC*,
 9 F.4th 893 (D.C. Cir. 2021) ......................................... 42, 45

*Fulton v. City of Philadelphia*,
 593 U.S. 522, 535 (2021) .....................................................30

*Great-West Life & Annuity Ins. Co. v. Knudson*,
 543 U.S. 204 (2002) .............................................................34

*Ickes v. Fox*,
 300 U.S. 82 (1937) ....................................................24, 25, 35

*In re Aiken County*,
 725 F.3d 255 (D.C. Cir. 2013)........................................36, 37, 38

*In re OPM Data Sec. Breach Litig.*,
 928 F.3d 42 (D.C. Cir. 2019)................................................54

*Ingersoll-Rand Co. v. United States*,
 780 F.2d 74 (D.C. Cir. 1985)................................................33

*Land v. Dollar*,
 330 U.S. 731 (1947) .....................................................24, 35

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).................................................................. 45, 51

*LeBlanc v. United States*,
  50 F.3d 1025 (Fed. Cir. 1995) .................................................................29

*Loeffler v. Frank*,
  486 U.S. 549 (1988) .................................................................................20

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................31

*Lummi Tribe of the Lummi Rsrv. v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) ...............................................................29

*\*Md. Dep't of Hum. Res. v. HHS*,
  763 F.2d 1441 (D.C. Cir. 1985)........................................... 22, 29, 30, 40

*\*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982)............................ 22, 25, 27, 28, 30, 55

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015)..................................................................48

*N. Air Cargo v. USPS*,
  674 F.3d 852 (D.C. Cir. 2012)..................................................................23

*Nat'l Ass'n of Postal Supervisors v. USPS*,
  26 F.4th 960 (D.C. Cir. 2022) ..................................................................23

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014)..................................................................44

*United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983)................................................................43

*OPM v. Richmond*,
  496 U.S. 414 (1990) .................................................................................38

*Phila. Co. v. Stimson*,
  223 U.S. 605 (1912) .................................................................................22

*Pollack v. Hogan*,
  703 F.3d 117 (D.C. Cir. 2012) ...................................................... 22, 23

*Schilling v. U.S. House of Representatives*,
  102 F.4th 503 (D.C. Cir. 2024) ...........................................................22

*Schron v. Troutman Sanders LLP*,
  20 N.Y.3d 430 (2013) ...........................................................................52

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .................................................................................23

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ...............................................................................44

*Service v. Dulles*,
  354 U.S. 363 (1957) ...............................................................................23

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) .................................. 27, 29, 30, 33, 35

*Son Broadcasting, Inc. v. United States*,
  42 Fed. Cl. 532 (1998) ............................................................ 29, 31, 33

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ............................................................33

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) .............................................................29

*Train v. City of New York*,
  420 U.S. 35 (1975) ................................................................... 37, 38, 39

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598, 610 (D.C. Cir. 1992) .................................... 28, 29, 30, 32

*United States v. Mitchell*,
  463 U.S. 206 (1983) ...............................................................................32

*Widakuswara v. Lake*,
  2025 WL 1288817 (D.C. Cir. May 3, 2025) .......................... 17, 31, 34

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985).................................................................46

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940) .................................................................................54

*Zukerman v. USPS*,
  961 F.3d 431 (D.C. Cir. 2020)................................................................54

**Statutes**

5 U.S.C. §702 ........................................................ 25, 26, 27, 33, 55

42 U.S.C. §7434........................................................... 2, 6, 7, 36, 39

N.Y.U.C.C. Article 4 ................................................................18

N.Y.U.C.C. §8-503(b).................................................................18

**Regulations**

2 C.F.R. §200.305 .......................................................................8

2 C.F.R. §200.340 ................................................................... 5, 45

2 C.F.R. §200.341 ....................................................................44

2 C.F.R. §200.343 .......................................................................8

89 Fed. Reg. 55,262 ................................................................ 5, 45

**Other Authorities**

168 Cong. Rec. H7702 (daily ed. Aug. 12, 2022) ......................................6

Hsu et al., FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors,
  Wash. Post (Feb. 27, 2025) ......................................................................10

Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM) ....................................9

Press Release, Administrator Zeldin Terminates Biden-Harris $20B 'Gold
  Bar' Grants, EPA (Mar. 11, 2025) ........................................................12

Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal
    Prosecutor, Wash. Post (Feb. 18, 2025) ................................................................10

Restatement (Third) Agency § 7.02 .........................................................................54

Unleashing American Energy, Executive Orders, The White House (Jan. 20,
    2025) .................................................................................................................9

# GLOSSARY OF TERMS

| Term or Abbreviation | Definition |
| --- | --- |
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. |
| CCIA | Clean Communities Investment Accelerator |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 (D.D.C.) |
| Doc. | Docket entry in *Climate United Fund, et al. v. Citibank, N.A., et al.*, 25-5122 (D.C. Cir.) |
| EPA | Environmental Protection Agency |
| FAA | Financial Agency Agreement |
| FBI | Federal Bureau of Investigation |
| GGRF | Greenhouse Gas Reduction Fund |
| IRA | Inflation Reduction Act |
| NCIF | National Clean Investment Fund |
| NOFO | Notice of Funding Opportunity |
| ODAG | Office of the Deputy Attorney General |
| USAO-DC | Office of the U.S. Attorney for the District of Columbia |

## INTRODUCTION

This case concerns EPA's effort to claw back funds already disbursed to grantees, in violation of the Constitution, an Act of Congress, and EPA regulations.

In the Inflation Reduction Act ("IRA"), Congress appropriated $26.97 billion for EPA to make clean-energy grants by September 30, 2024. EPA complied with that deadline and awarded grants to Plaintiffs. Unlike in many grant programs, EPA disbursed all the funds to Plaintiffs at the outset. The funds not yet invested onward now reside at Citibank accounts titled to Plaintiffs and their subgrantees.

Following the change in Administration, EPA concluded the grants conflict with EPA's new priorities. EPA instructed Citibank to freeze Plaintiffs' funds, then purported to terminate the grant programs, and now seeks to claw back Plaintiffs' money, ostensibly to re-obligate it. That is illegal. It violates the Separation of Powers and the IRA, which do not permit EPA to redo the program after the statutory deadline. It violates EPA's regulations, which do not authorize termination for changed priorities. And it violates the ban on arbitrary-and-capricious agency action.

EPA scarcely defends the legality of its conduct. It contends Plaintiffs' claims belong in the Court of Federal Claims. But Plaintiffs do not bring contract claims against EPA and seek no money from the Treasury. They seek to enjoin EPA from unlawfully interfering with property that is already theirs. The Court should follow longstanding precedent establishing that such claims belong in an Article III court.

## STATEMENT OF THE CASE

**A.    The Inflation Reduction Act's Greenhouse Gas Reduction Fund.**

In 2022, Congress enacted, and President Biden signed into law, the Inflation Reduction Act. Pub. L. No. 117-169. The IRA authorized EPA to establish the Greenhouse Gas Reduction Fund ("GGRF") to finance "the rapid deployment of low and zero-emission products, technologies, and services." 42 U.S.C. §7434(c)(1). Congress appropriated $26.97 billion "until September 30, 2024" for EPA "to make grants, on a competitive basis." *Id.* §7434(a).[1]

EPA established three GGRF grant programs: The National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for All. EPA funded each program from IRA appropriations: $13.97 billion for NCIF, $6 billion for CCIA, and $7 billion for Solar for All.

The two programs at issue here—NCIF and CCIA—were designed to "work in tandem to deploy much-needed capital for clean technologies into communities across the country." JA1735. NCIF aims to "create centralized, long-term financing institutions with the scale required to transform financial markets," while CCIA seeks to "build the capacity of community lenders to draw on that capital to catalyze deployment of projects in communities all across the country." JA1735-36.

---

[1] All citations are cleaned up and emphases are added.

In July 2023, EPA issued Notices of Funding Opportunity ("NOFO") for NCIF and CCIA. The NCIF NOFO contemplated "grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector" to finance "tens of thousands of clean technology projects." JA1736. The CCIA NOFO contemplated "grants to 2-7 hub nonprofits that will provide funding and technical assistance" to "public, quasi-public, not-for-profit, and nonprofit community lenders" to "deploy clean technology projects" in "homes, small businesses, schools, and community institutions." JA1661. Both NOFOs allowed coalition applicants, "composed of one lead applicant, which partners with … non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants)[.]" JA1738-39; JA1664-65.

## B.     EPA Selects the NCIF and CCIA Plaintiffs to Receive Grants.

Consistent with the September 30, 2024 deadline Congress set for EPA to obligate GGRF funds, EPA announced grants to the NCIF and CCIA Plaintiffs in April 2024, and obligated funds in August 2024.

*The NCIF Plaintiffs.* Climate United, a coalition of established nonprofits with a combined 120 years of experience managing more than $30 billion to address climate change, was awarded $6.97 billion. Coalition for Green Capital ("CGC"), a not-for-profit established over a decade ago to support the development of national, state, and local green banks, was awarded $5 billion. Power Forward Communities

("PFC"), a coalition of nonprofits with nearly a century of combined experience in financing and developing affordable housing projects, was awarded $2 billion.[2]

**The CCIA Plaintiffs.** Inclusiv, Inc., a 50-year-old nonprofit focused on deploying capital to low-income communities through credit unions, was awarded $1.87 billion, 90% of which will pass through to subrecipient credit unions. Justice Climate Fund, a nonprofit coalition of highly experienced community-development organizations assisting small lenders in underserved and unbanked regions of the U.S., was awarded $940 million.

**The Subgrantees and Subgrantee Plaintiffs.** The NCIF and CCIA Plaintiffs worked with subgrantees, including CGC subgrantees California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority (the "Subgrantee Plaintiffs"), which are state green banks that fund pollution-reducing projects in their states.

Each GGRF grantee executed an award agreement with EPA in August 2024 and an amended agreement in December 2024.[3] Therein, Plaintiffs agreed to rigorous reporting requirements. Plaintiffs must provide EPA: quarterly conflict-of-

---

[2] As is typical, the established organizations formed Climate United and Power Forward Communities as new entities for this project. JA124 ¶¶42-43; JA453 ¶5.

[3] Because the award agreements and Account Control Agreements of each set of Plaintiffs (NCIF, CCIA, and Subgrantee) are substantially similar, the Joint Appendix includes representative samples. JA1020 (Award Agreement); JA1082 (Amended Award Agreement); JA1143 (grantee ACA); JA1176 (sub-grantee ACA).

interest reports, JA1130; JA1918; quarterly (NCIF) or semi-annual (CCIA) data reports, JA1096-97; JA1884; and annual reports with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," JA1095-96; JA1882-83.

Under EPA regulations applicable to all "EPA financial assistance agreements awarded … on or after July 1, 2024," the grants could be terminated on the basis that they "no longer effectuate[] … agency priorities" *only* if that ground is "clearly and unambiguously included in the terms and conditions of the award." Applicability Date for the Office of Management and Budget's Regulatory Revisions, 89 Fed. Reg. 55,262, 55,263 (July 3, 2024). That ground is not (and never was) included in the NCIF or CCIA awards, meaning the regulations never allowed termination based merely on agency priorities. *See* JA1059; JA1846-47 (original awards, invoking "*the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024*, pursuant to 89 FR 55262")). EPA is thus incorrect that the grants were amended in December 2024 to "restrict EPA's ability to terminate them." Br.9. EPA was *never* authorized to terminate the grants based on a change in agency priorities.

Under 2 C.F.R. §200.340 and Plaintiffs' grants, EPA can terminate Plaintiffs' awards for only three reasons: (1) substantial noncompliance with grant obligations; (2) material misrepresentation of eligibility status; or (3) "Waste, Fraud, or Abuse," meaning a violation of criminal-fraud, conflict-of-interest, bribery, or gratuity laws

or of the civil False Claims Act. JA969-70. Consistent with Congress's deadline for obligating funds, if any grant funds are returned, they must be redistributed among the remaining (i.e., current) NCIF or CCIA awardees. JA996; JA1910.

### C. The NCIF and CCIA Plaintiffs Enter Into Account Control Agreements with EPA and Citibank.

Congress mandated that GGRF grantees "provide financial assistance to" and "prioritize investment in" clean-energy projects. 42 U.S.C. §7434(b)(1). The goal was to "capitalize" green banks or, in the case of the CCIA Plaintiffs, community-lender subrecipients, and "use that capitalization funding to leverage private investment in amounts several times greater than the initial public investment." 168 Cong. Rec. H7702 (daily ed. Aug. 12, 2022) (statement of Rep. Dingell). To "ensure continued operability," Congress required grant recipients to "retain, manage, recycle, and monetize all repayments and other revenue received from … using grant funds." 42 U.S.C. §7434(b)(1)(C).

Because these goals could be achieved only if grantees' funds were reflected as unencumbered capital on their balance sheets, the GGRF program necessitated a "disbursement of the maximum funding amount" at the outset, to enable "climate bank[s] to leverage more private financing." 168 Cong. Rec. H7702; JA 1771 (NCIF NOFO explaining that grantees should expect to receive the full grant amount "as an asset at the beginning of the period of performance").

6

EPA structured the NCIF and CCIA programs in line with these objectives, requiring an initial disbursement of all grant funds into grantees' accounts at Citibank. JA1136. The grants categorize the disbursement of the entire award amount deposited at grantee accounts at Citibank as "Capitalization by Nonexchange Capital Contribution," to serve as unencumbered investment capital and to be recognized as a type of "program income." JA1134. Thus, as soon as the funds were deposited into grantee accounts at Citibank, legal title passed to the grantees for use to further Congress's directives, including to reinvest and redeploy. 42 U.S.C. §7434(b). Even after the period of performance, moreover, "the Recipient may keep and use Program Income" to advance program goals under EPA supervision, JA1122, and is "entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing," JA1136.

While funds are at Citibank, Citibank's actions are governed by Account Control Agreements ("ACAs") between Citibank, EPA, and each NCIF and CCIA Plaintiff. *E.g.*, JA1143; JA1931. Each subgrantee—including the state green banks—must sign a separate ACA with Citibank and its respective grantee, but not EPA. *E.g.*, JA1176. Citibank separately entered into a Financial Agency Agreement ("FAA") with Treasury. JA2127.

***The ACAs.*** As noted, Citibank was required to sign ACAs with each grantee and subgrantee as accountholder, and the respective secured party for each account.

EPA is the secured party for grantee accounts, while the grantees (not EPA) are the secured party for subgrantee accounts. No government entity is party to the subgrantees' ACAs.

Like the grant agreements, the ACAs make clear that Plaintiffs and subgrantees hold legal title to their funds at Citibank. This includes providing that Citibank "maintains the Accounts for [Plaintiffs]," and that Plaintiffs are "the entitlement holder[s] with respect to all financial assets credited from time to time to the Accounts." JA1144. Under the ACAs, Citibank must follow all instructions from accountholders—i.e., Plaintiffs and their subgrantees—"directing the disposition of funds and financial assets in the Accounts." JA1145. The only exception is if the "Secured Party" (EPA for grantee accounts, the grantee for subgrantee accounts) issues a Notice of Exclusive Control—i.e., "a written determination and finding" that one of the three grounds for termination was triggered. JA1145; JA1170. No such Notice has ever issued.[4]

**The FAA.** Citibank and Treasury entered into the FAA in September 2024. JA2127. Like the grant agreements and ACAs, it recognizes Plaintiffs', not EPA's, title to the funds: it requires Citibank to establish "accounts in the names of the three

---

[4] Contrary to EPA's claim (at 10), the January 2025 amendments to the NCIF ACAs simply clarified, consistent with 2 C.F.R. §§200.305(b)(6) & 200.343, that grantees are entitled to reimbursement for costs "properly incurred" *before* (not after) any Notice of Exclusive Control. *See* JA1145; JA1165.

NCIF and five CCIA grant recipients," directs Citibank to maintain a "customer relationship with each Prime Recipient and Subrecipient Account holder," and provides that each grantee and subgrantee "account holder will have the ability to access and use funds in their respective accounts," JA2145, with EPA holding a security interest in the accounts of the grantees (but not the subgrantees), JA2147-48. The FAA also requires Citibank to provide EPA "full account visibility," JA2149, including real-time view access.

### D. The Administration Freezes Plaintiffs' Funds.

On January 20, 2025, President Trump issued an Executive Order purporting to "Terminat[e] the Green New Deal" and directing that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act."[5] That same week, OMB issued implementing memoranda.

Although these actions led to the freeze of other IRA climate-related funding, they could not reach Plaintiffs' funds because they were already disbursed. Thus, beginning on February 12, EPA Administrator Lee Zeldin announced EPA's goal to claw these funds back,[6] stating that Citibank "must immediately return the funding." JA140-43. He further vowed to work with "the Inspector General's Office and … the

---

[5] Unleashing American Energy, Executive Orders, The White House (Jan. 20, 2025).

[6] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

Justice Department" to recover the funds, asserting that "the entire [GGRF] scheme," "in [his] opinion, is criminal." *Id.*

Meanwhile, Plaintiffs' access to their funds at Citibank was frozen without explanation. JA972. Plaintiffs were left to read press reports that, on February 17, the Office of the Deputy Attorney General ("ODAG") asked the U.S. Attorney's Office in Washington, D.C. ("USAO-DC"), apparently at EPA's behest, to open a criminal investigation.[7] After reviewing the documentation provided by ODAG, the Chief of the Criminal Division at USAO-DC advised that no "predicate for opening such a grand-jury investigation existed."[8] When ODAG persisted, she was forced to resign.[9] Published reports also state that, without signoff from other prosecutors, the Interim U.S. Attorney in Washington submitted a seizure warrant application to a magistrate judge, who rejected it for lack of probable cause.[10]

As Plaintiffs later learned, despite the lack of a freezing order, FBI sent Citibank a letter in February 2025 "recommend[ing]" that Citibank freeze the assets in Plaintiffs' accounts. JA99-103. Without any factual support, the letter referenced

---

[7] Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor, Wash. Post (Feb. 18, 2025).

[8] *Id.*

[9] *Id.*

[10] Hsu et al., FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors, Wash. Post (Feb. 27, 2025).

"credible information" that Plaintiffs' accounts had "been involved in possible criminal violations." JA100. Starting in mid-February, Citibank chose to follow this "recommendation" and began disregarding Plaintiffs' instructions. JA972.

On March 2, EPA Deputy Administrator McIntosh asked EPA's Inspector General to investigate GGRF funding. JA105-09. Two days later, on March 4, Treasury—at EPA's bidding—"instruct[ed] Citibank not to disburse any GGRF funds through March 9," citing unspecified "concerns regarding potential fraud and/or conflicts of interest related to the [GGRF]." JA972.

That same day, March 4, Plaintiffs received letters from Mr. McIntosh expressing EPA's concern over the oversight mechanisms of the program and instructing Plaintiffs to respond to up to 35 information requests by March 28. *Id.*

On March 8, Mr. McIntosh told Citibank that, because of the "current lack of critical information," EPA had requested information from grantees to assess "potential patterns of waste, fraud or abuse." JA694. On March 10, EPA emailed Citibank, again alluding to "concerns regarding potential fraud and/or conflicts of interest" in the GGRF and explaining that EPA would evaluate its concerns "based on incoming responses [from Plaintiffs] to oversight questions" due March 28. JA65-66.

Unable to access their funds, the NCIF Plaintiffs sued. Climate United sued EPA and Citibank on March 8, and sought a TRO two days later, while CGC and

PFC sued Citibank in New York. JA974-75. After the District Court proposed a TRO hearing on March 11, Climate United consented to EPA's request, as a professional courtesy, to extend the hearing date by 24 hours. JA974.

But on the evening of March 11—*after* the originally scheduled TRO hearing—EPA sent materially identical "Notices of Termination" to all NCIF and CCIA grantees. JA390; JA398; JA1197; JA1949. The Notices contained no individualized findings or allegations, and instead generically cited "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.*

### E.     The District Court Enters a Preliminary Injunction.

CGC, PFC, the Subgrantee Plaintiffs and the CCIA Plaintiffs then sued EPA and Citibank in D.D.C., JA974, and the District Court entered a TRO enjoining EPA from implementing the purported terminations and barring Citibank from transferring funds to Treasury, JA287.

Plaintiffs then moved for a preliminary injunction. In its principal opposition, EPA conceded—contrary to the agency's public statements, Notices of Termination, and claims in this Court, *see* Br.10-11—that "EPA did not terminate for Plaintiffs' noncompliance" or any other "conduct of Plaintiffs." JA503-04. Rather, EPA terminated the programs based on "its assessment of the agency's priorities." JA480.

On April 15, 2025, the District Court entered a preliminary injunction. The court applied this Court's *Megapulse* test and concluded it had subject-matter jurisdiction. It explained: "Plaintiffs do not challenge a mere contract between the parties—they challenge agency action governed by statutes[,] regulations," and the Constitution. JA983. And Plaintiffs permissibly "seek equitable relief vindicating their rights to access their grant funds." JA984. The Supreme Court's stay order in *Department of Education v. California* is inapposite here, the court explained, as Plaintiffs "seek to regain access to their already disbursed funds at Citibank," not "an order mandating the government to pay." JA986.

Turning to the merits, the District Court concluded that Plaintiffs are likely to succeed. The court held that EPA never explained its freeze of Plaintiffs' funds or why the programs' wholesale cancelation was necessary, JA991-93, and that EPA violated the "plain language of the regulations that govern its decision-making in grant funding," JA994. The court held that EPA also violated the IRA and the Constitution, as Congress set forth "what EPA could do with the money," and "provided specific deadlines and specific requirements." JA995. EPA's cancellation was "without any basis in statutory authority." *Id.*

As to Citibank, the District Court recognized that Citibank could freeze Plaintiffs' accounts *only* "in accordance with the [ACAs]" and "*only* in response to 'lawful instructions or directions' from Treasury." JA996-97. Because neither

condition was satisfied, the District Court mandated that Citibank comply with the ACAs.

On the equities, the District Court found that irreparable harm is unavoidable "without release of [Plaintiffs'] grant funds." JA997; *see also* JA998-1000 (detailing harms). By contrast, any potential harm to EPA is negligible, as there are more than "sufficient protections in place to prevent the type of reckless spending EPA envisions once access to Plaintiffs' accounts is restored." JA1002.

## SUMMARY OF THE ARGUMENT

The District Court properly exercised jurisdiction and did not abuse its discretion in granting a preliminary injunction. EPA's suspension of Plaintiffs' grants and wholesale termination of the NCIF and CCIA programs was illegal, and the District Court was authorized to order EPA to conform to the law.

The District Court had jurisdiction over Plaintiffs' claims against EPA and Administrator Zeldin. Contrary to EPA's contention, this case does not belong in the Court of Federal Claims.

Crucially, Plaintiffs do not seek an injunction that would cause the Treasury to continue disbursing funds. To the contrary, the funds were *already* disbursed to Plaintiffs, and Plaintiffs hold legal title to them. EPA holds a security interest in grantees' accounts, but it has never exercised that interest.

Invoking the Court's *Megapulse* test, EPA contends that the APA's waiver of sovereign immunity does not apply because the Tucker Act impliedly forbids the Court from exercising jurisdiction. But the Court need not even consider whether the APA's waiver applies because no waiver is necessary. Plaintiffs allege that Administrator Zeldin acted *ultra vires* and seek purely equitable relief against him. Unlike in EPA's cases addressing the interplay between the APA and the Tucker Act, Plaintiffs seek no funds from the Treasury because those funds have already been disbursed. Longstanding precedent establishes that sovereign immunity does not attach in these circumstances.

Even if the *Megapulse* test applies, it is satisfied. Plaintiffs do not invoke contractual rights, but instead invoke the Appropriations Clause, the Separation of Powers, the Inflation Reduction Act, EPA's regulations, and the APA. There is a perfect symmetry between Plaintiffs' claims and the relief they seek: if the District Court merely enforces the law Plaintiffs invoke, Plaintiffs will obtain all the relief they seek. Further, Plaintiffs do not seek any money from the Treasury akin to what they would obtain in the Court of Federal Claims, but instead seek to enjoin unlawful federal interference with previously disbursed funds.

Plaintiffs are likely to succeed on the merits. EPA violated the Constitution and the IRA. The IRA requires EPA to obligate GGRF grant funds by September 30, 2024. EPA did so and cannot now undo its prior acts. EPA insists it will re-

obligate the funds, but even if this Court determines that the District Court clearly erred in concluding it would not, that would still violate the statutory requirement that the funds be obligated by September 30, 2024. EPA is legally required—by statute and the Constitution, not only by contract—to stick with the existing grantees.

EPA also acted arbitrarily and capriciously. EPA's vague and unsubstantiated concerns did not justify wholesale termination of the entire programs.

Finally, EPA violated its regulations. Those regulations require EPA to explain the rationale for termination and forbid EPA from terminating based merely on policy disagreements—which EPA admits is the only reason invoked to cancel the grant programs. EPA cannot avoid scrutiny of these violations merely because EPA also, independently, breached its grant agreements.

The District Court did not clearly err or abuse its discretion in concluding that the wholesale termination of the programs would inflict devastating economic and reputational harms on Plaintiffs. The balance of equities and public interest weigh in Plaintiffs' favor because neither EPA nor the public has an interest in EPA breaking the law, particularly given EPA's extensive oversight of the programs and the existing safeguards that ensure the funds are used to further Congress's goals.

The District Court properly granted a preliminary injunction against Citibank. The court had jurisdiction over Citibank, which cannot be sued in the Court of Federal Claims, and it correctly concluded that Citibank breached the ACAs. Even

if Plaintiffs must sue EPA in the Court of Federal Claims, Citibank cannot invoke "derivative sovereign immunity" because Citibank improperly seeks a much broader immunity than EPA—immunity from suit in all forums.

## ARGUMENT

## I. The Court Should Affirm The Preliminary Injunction Against EPA.

### A. The District Court Has Subject-Matter Jurisdiction.

EPA's principal argument is that the District Court lacked jurisdiction because Plaintiffs' claims belong exclusively in the Court of Federal Claims. That is wrong: Unlike in EPA's authorities, including *Department of Education v. California*, 145 S.Ct. 966 (2025) (per curiam) and *Widakuswara v. Lake*, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam), Plaintiffs seek to enjoin *ultra vires* conduct rather than mandate payment from the Treasury under a contract, because the funds were already disbursed to Plaintiffs' accounts. Thus, sovereign immunity does not apply, meaning no waiver is needed. Alternatively, the APA's sovereign-immunity waiver covers all claims, and none must proceed under the Tucker Act.

### 1. Plaintiffs Seek An Order Prohibiting EPA's Interference, Not An Order Enforcing A Contractual Debt For Money.

Before turning to the sovereign-immunity analysis, we begin with a critical factual point. EPA's argument turns on the proposition that sovereign immunity bars claims "to enforce a contractual obligation to pay money." *Dep't of Educ.*, 145 S.Ct. at 968. But no "contractual obligation to pay money" is at issue here, even indirectly,

because Treasury disbursed the grantees' funds in 2024, whereupon they were deposited at Citibank and the grantees became the legal owners of the funds for use as Congress intended. That makes sovereign immunity inapposite (Point I.A.2.); it alternatively makes the APA's waiver fully applicable while rendering EPA's authorities, including *DOE* and *Widakuswara*, completely inapt (Point I.A.3.).

There is no doubt that the money at Citibank belongs to Plaintiffs and their subgrantees. The ACAs state that Citibank "maintains the Accounts for [Plaintiffs]"; and that Plaintiffs are "the entitlement holder[s] with respect to all financial assets credited from time to time to the Accounts." JA1144. And Citibank must follow *all* accountholder instructions "directing the disposition of funds and financial assets in the Accounts," subject *only* to the exercise of specified security interests under the UCC. JA1145. Plaintiffs thus hold property interests in their financial assets. JA1144 (citing New York UCC); N.Y.U.C.C. Article 4 (governing bank deposit); N.Y.U.C.C. §8-503(b) (property interest of entitlement holder). To be sure, EPA has a security interest in the grantees' accounts. But this does not mean EPA owns the underlying funds, any more than banks own houses subject to mortgages.

Of course, there are limits on Plaintiffs' use of the funds; they can be used only as Congress directed. If a grantee breaches grant terms, the ACAs authorize EPA to take control of the funds as a secured party by sending a Notice of Exclusive Control to Citibank. But EPA has not done so, so the money at Citibank is Plaintiffs'.

EPA contends (at 26) that because Citibank entered into the FAA, Citibank is "acting as an arm of Treasury." EPA mischaracterizes the FAA. The FAA, like the ACAs, states that prime recipients' accounts are "in the names of the three NCIF and five CCIA grant recipients," with EPA only a "secured party." JA2145. Likewise, the FAA states subgrantees' accounts are "in the names of" subgrantees. JA2145. The grantees and subgrantees are "responsible" for directing Citibank "as to what type of account to create; amounts to transfer into Subrecipient accounts; and how to allocate the amount of funding[.]" JA2145. And Citibank shall "invest" "liquidity" "at the direction of the Prime Recipients and Subrecipients." JA2148.

To be sure, Citibank provides services to EPA, such as account visibility, JA2149, and provides such services as a financial agent, JA2128 ("The Financial Agent shall perform the services required under this FAA"). But the fact that Citibank has certain *duties* to Treasury (and EPA) as a *custodian* of Plaintiffs' property does not transform that property into Citibank's or its principal's (Treasury), just as Citibank does not own deposits in ordinary checking accounts.

EPA contends (at 26) that it "makes no difference" whether the money is at Treasury or Citibank. Of course it makes a difference. Not only do Plaintiffs' property rights affect the entire sovereign-immunity calculus, as explained below, but they are also fundamental to the program's structure. The program's funding strategy was intentionally designed from inception to give the grantees title to the

funds. The deposit of all the funds into grantee accounts at Citibank at the outset was critical to achieving Congress's goals of capitalizing financial institutions and accomplishing a multiplier effect in attracting private investment. *Supra* at 6-7. Giving grantees title to the funds to be used as investment capital would incentivize private investments because it made those investments safer, precisely *because* grantees had a stronger legal claim to the money if grantees did not depend on Treasury payments. EPA intended for Plaintiffs' legal title to make a difference— and it does.

### 2.   No Waiver of Immunity Is Needed, As Sovereign Immunity Does Not Apply In The First Place.

EPA asserts there is no jurisdiction to enjoin unlawful interference with Plaintiffs' funds and grants because the APA's sovereign-immunity waiver does not apply under *Megapulse*. That is wrong (*see* Point I.A.3.), but EPA's argument fails at the threshold because sovereign immunity does not apply, so no waiver is needed.

"Sovereign immunity bars 'a suit by private parties seeking to impose a liability which must be paid from public funds in the … treasury.'" *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S.Ct. 753, 755 (2025) (Alito, J. dissenting) (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). And it bars a suit naming the United States or an agency as a defendant. *Loeffler v. Frank*, 486 U.S. 549, 554 (1988).

This case does neither. Plaintiffs sued Administrator Zeldin in his official capacity and seek to prohibit *ultra vires* conduct, not to mandate payment from

Treasury. As a result, "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). And if the naming of EPA as a defendant is an issue, enjoining Administrator Zeldin would provide complete relief.

We note that *DOE*, *Widakuswara*, and EPA's other cases did not consider this issue. That is because in each case the plaintiffs sought disbursement of money from Treasury, thus requiring plaintiffs to show a waiver of immunity. The fact that the antecedent sovereign-immunity question even arises here highlights the novelty of EPA's position. EPA cites no case where the government successfully invoked sovereign immunity to defeat claims seeking no payment from Treasury, but only an injunction against *ultra vires* conduct interfering with private property.

**a.** "Prior to the APA's enactment, … courts had recognized the right of judicial review of agency actions that exceeded authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Congress strengthened the right of judicial review of agency action in 1946 in the APA.

Whether claims proceed under that equitable jurisdiction or another right of action (including the APA's), courts "reject the assertion of sovereign immunity if a plaintiff brings a suit for 'injunctive [or] declaratory relief' against a federal officer for an *ultra vires* act." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) (quoting *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012)). "[I]n case of an injury threatened by [an officer's] illegal action, the officer cannot claim immunity from injunction process" halting the illegal conduct. *Phila. Co. v. Stimson*, 223 U.S. 605, 620 (1912), *superseded in part by statute*.

Given that history, the APA initially did not include a sovereign-immunity waiver. Congress added the waiver in 1976 (with the implied limitation for contract claims), thus doing away with the sovereign-immunity defense in certain cases—*e.g.*, claims for "specific relief" in federal-grant cases, as in *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1446-48 (D.C. Cir. 1985) ("*Maryland*"). But no waiver need be established to enjoin *ultra vires* conduct not implicating sovereign immunity. *See id.* at 1448 n.2 (not addressing whether conduct was *ultra vires* because waiver applied); *Reich*, 74 F.3d at 1328-29. And the Tucker Act, which existed when the Supreme Court endorsed *ultra vires* review, does not limit that doctrine.

**b.** Under these principles, sovereign immunity is no obstacle to Plaintiffs' claims. *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 969 (D.C. Cir. 1982) ("[T]he jurisdictional bar of sovereign immunity in property disputes arising from

contractual relationships does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority"). We analyze these claims one by one.

As noted, even before the APA's enactment, courts reviewed and enjoined officers' non-compliance with the Constitution and congressional directives. The District Court thus has jurisdiction to enjoin Administrator Zeldin from violating the Constitution and the IRA as *ultra vires* conduct. *Pollack*, 703 F.3d at 120; *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971-72 (D.C. Cir. 2022).

Similarly, as this Court instructed, "an agency acts *ultra vires* when its decision is not supported by 'a contemporaneous justification by the agency itself,'" but only a "*post hoc* explanation [by] counsel.'" *Postal Supervisors*, 26 F.4th at 975 (quoting *N. Air Cargo v. USPS*, 674 F.3d 852, 860 (D.C. Cir. 2012)). The Supreme Court enjoined arbitrary agency action on this basis "[l]ong before the passage of the APA." *N. Air Cargo*, 674 F.3d at 860 (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). Thus, sovereign immunity does not bar enjoining Administrator Zeldin from arbitrarily exercising purported authority to redo a grant program.

And although this Court has not squarely resolved the issue, the same principles apply to Plaintiffs' claims to enforce regulations. As much as statutes, "regulations" adopted by an agency under congressional authority "are binding upon [executive officers] as well as the citizen." *Service v. Dulles*, 354 U.S. 363, 372

23

(1957). And, before the 1946 APA (and its 1976 waiver), the Supreme Court set aside agency action that contravened regulations. *Ariz. Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 390 (1932).

**c.** The fact that Plaintiffs originally acquired their property rights under government contracts does not affect this analysis. Indeed, the Supreme Court has rejected a defense of sovereign immunity where government officials "unlawfully seize[d] or h[e]ld a citizen's realty or chattels" derived from a government contract, instructing that such plaintiffs are "not relegated to the Court of Claims to recover a money judgment." *Land v. Dollar*, 330 U.S. 731, 735-36, 738 (1947).

Take, for example, *Ickes v. Fox*, 300 U.S. 82 (1937). The plaintiffs contracted with the government for certain water rights. *Id.* at 89. When the Secretary of the Interior ordered a reduction of their "vested water rights," plaintiffs sued. *Id.* at 91-92. The government sought dismissal, contending "the relief sought is the substantial equivalent of specific performance of these contracts." *Id.* at 96.

The Supreme Court disagreed. Plaintiffs alleged that "ownership is in them and not in the United States." *Id.* Thus, they sought not specific performance, but "to enjoin the Secretary" from "enforcing an order, the wrongful effect of which will be to deprive respondents of vested property rights not only acquired under Congressional acts, state laws *and government contracts*, but settled and determined

by his predecessors in office." *Id.* at 96-97. The Court held that the right to maintain such suits in Article III courts had long "been established." *Id.*

So too here. Although there are regulatory and contractual limits on Plaintiffs' use of GGRF funds (and potential contractual termination rights for grantee non-compliance, which EPA has never alleged, *see* JA503-04), the funds were disbursed and Plaintiffs have a vested property right in them. Plaintiffs properly may seek an injunction barring *ultra vires* conduct. *Megapulse,* 672 F.2d at 969.

### 3. Congress Waived Any Sovereign Immunity In The APA.

Regardless, the District Court could proceed under the APA's sovereign-immunity waiver. The court evaluated whether EPA's dismantling of the NCIF and CCIA programs complied with the IRA and the Separation of Powers, and considered whether EPA engaged in reasoned decisionmaking and complied with regulations. The APA's waiver applies to Plaintiffs' standard-fare administrative-law claims for prohibitory relief, and the Tucker Act does not impliedly bar any of these claims.

### a. Plaintiffs "seek relief other than money damages."

The sovereign-immunity waiver in APA §702 facially applies to claims that seek "relief other than money damages." That standard is readily met, and EPA does not meaningfully dispute it.

As the Supreme Court explained, there is a "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for … 'the recovery of specific property or monies.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Plaintiffs plainly seek "relief other than money damages" under §702.

*First*, as explained above, Plaintiffs do not seek an order *mandating* EPA to disburse money or perform any affirmative act. They seek, and preliminarily obtained, a prohibitory injunction *barring* EPA from interfering with their funds and illegally dismantling the grant programs.

*Second*, although one result of the District Court's injunction is that grantees' funds would flow from their Citibank accounts, this mandatory injunction applies only, and permissibly, to Citibank, and it does not direct payment of "money damages," because there is no payment of "money in compensation for the losses." *Bowen*, 487 U.S. at 895. Rather, the money was already deposited into grantees' accounts at Citibank, and is their "specific property or monies." *Id.* at 893.

b.    <u>No other statute "impliedly forbids" the relief sought.</u>

EPA contends the APA sovereign-immunity waiver does not apply because Plaintiffs' claims supposedly belong in the Court of Federal Claims. EPA is wrong.

**1.** The starting point here is APA §702. This Court has said that "[t]he waiver of sovereign immunity in the Administrative Procedure Act does not run to actions seeking declaratory relief or specific performance in contract cases, because that waiver is by its terms inapplicable if 'any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,' and the Tucker Act and Little Tucker Act impliedly forbid such relief." *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (quoting §702). The Court further instructed that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

*Sharp* elaborates these principles in a manner directly relevant to this case. The plaintiff was both a federal judge and Air Force Lieutenant Colonel. He sought to enjoin his transfer to the Standby Reserve, alleging it would violate *both* (1) the Constitution, statutes, and regulations *and* (2) a contract. 798 F.2d at 1521-22. This Court, per then-Judge Scalia, "h[e]ld that the District Court lacked jurisdiction … over appellant's claim for a declaration that appellees would violate their contractual obligations," *id.* at 1524, but the District Court could enjoin the transfer based on the "complain[t] that his transfer would be contrary to regulations, statutes and the Constitution," *id.* at 1523.

As this Court explained, "[t]he lesson of *Sharp*, we think, is straightforward": "litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992). "Crucially," the Court noted, "*Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.* "In addition, and also crucial, *Sharp* tells us that a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Id.*

Also of note, the Court made clear in *Megapulse* that the government may not defeat jurisdiction by raising a contractual defense. "[A]n action for trespass" does not become a contract case just because "[a] license … may be raised as a defense." 672 F.2d at 968. Applying that principle, *Megapulse* found jurisdiction over trade-secret claims despite the government arguing based on a contract that it "lawfully came into possession of the property and [wa]s empowered by the contract to put the entrusted information out for commercial use" as plaintiffs alleged. *Id.* at 969.

**2.** Both *Megapulse* factors favor jurisdiction. The "source of rights" is the Constitution, statutes, and regulations, not government contracts. And the "type of

relief sought" is an injunction preventing unlawful interference with Plaintiffs' property and the grant programs, not an order mandating payment from Treasury. As in *Transohio* and *Sharp*, we analyze each claim "individually," emphasizing that if any claim is deemed contractual, the balance would remain. *Transohio*, 967 F.2d at 610; *Sharp*, 798 F.2d at 1523-24.

*IRA and Constitution*. Begin with Plaintiffs' claim that EPA violated the IRA and the Separation of Powers. At the outset, the APA's waiver applies because there is no jurisdiction in the Court of Federal Claims. The need to address "when and to what extent … Tucker Act jurisdiction precludes the availability of relief under the APA" under *Megapulse* "only arises when a plaintiff's substantive claim—apart from the type of relief the complaint seeks—is a claim over which Tucker Act jurisdiction could be invoked." *Maryland*, 763 F.2d at 1449; *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) ("There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.").

The Court of Federal Claims does not have jurisdiction over Plaintiffs' claim that EPA violated the Separation of Powers and the IRA. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). "[T]he cornerstone of … Tucker Act jurisdiction is the money-mandating requirement." *Son Broadcasting, Inc. v. United States*, 42 Fed. Cl. 532, 535 (1998). And, as EPA urges (at 22), the IRA and the Constitution contain no such requirement, dooming jurisdiction there. *Id.*; *Lummi*

*Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017). In that context, to deprive the District Court of jurisdiction, the Court "would have to find that, in enacting the APA and the Tucker Act, Congress intended to preclude any review at all of constitutional claims seeking equitable relief, where the constitutional claims stem from contracts." *Transohio*, 967 F.2d at 611. This Court has declined to make that presumption. *Id.*

Regardless, the claim is not "in essence" contractual under *Megapulse*, *Sharp*, and *Transohio*. Plaintiffs seek to enjoin EPA from violating the Constitution and the IRA. Just as in those cases, Plaintiffs permissibly bring constitutional and statutory claims, even though they would not be in court without a government contract. *Sharp*, 798 F.2d at 1521-22. As Judge Bork put it, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Maryland*, 763 F.2d at 1449. And the Constitution fully applies. *Cf. Fulton v. City of Philadelphia*, 593 U.S. 522, 535 (2021) (rejecting notion "that governments should enjoy greater leeway under the Free Exercise Clause when setting rules for contractors than when regulating the general public").

Moreover, the fact that EPA has the right to terminate an individual grant for noncompliance (and related security interests), much like the contractual defense raised in *Megapulse*, does not make this a contract claim. 672 F.2d at 968. EPA does

not even allege termination is proper under the grant terms, and has never invoked its security interests, but rather seeks to terminate everything for reasons of policy. Under *Megapulse*, that defense does not defeat jurisdiction.

And Plaintiffs' claims differ from those in *Widakuswara*, where the Court emphasized that Congress only required the government to make grants—not the monthly payments from Treasury plaintiffs requested. 2025 WL 1288817, at *4. Here, Congress required EPA to obligate grants by September 2024, and it did. Plaintiffs seek to prevent a do-over and claw back of their property. If EPA follows the IRA (and Citibank its contracts), Plaintiffs will get complete relief (Point I.B.).

***Reasoned decision-making***. EPA claims the statutory authority to undo and redo the GGRF program. Plaintiffs dispute that, but if EPA has that statutory authority, then the District Court may "fix[] the boundaries of the [claimed] delegated authority, and ensur[e] [EPA] engaged in reasoned decisionmaking within those boundaries." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024).

Here again, there is no jurisdiction in the Court of Federal Claims as the reasoned-decisionmaking rule does not reflect a "money-mandating requirement" (and Plaintiffs do not invoke one to support a mandatory injunction directing payment). *Son Broadcasting*, 42 Fed. Cl. at 535. The District Court had jurisdiction to enforce the longstanding, reasoned-decisionmaking requirement with an injunction barring non-compliance. *Cf. City of Kansas City v. HUD*, 923 F.2d 188,

193 (D.C. Cir. 1991) ("Even if HUD may permissibly read section 111 as allowing termination of Kansas City's [grant] agreement without notice and hearing, the agency termination action remains subject to the independent arbitrary and capricious standard of review.").

EPA says "Plaintiffs would have no claim absent the government's alleged breach of [its] agreements." Br.22. But *Megapulse* does not "impose a 'but-for' test for identifying the source of the right," and a contractor may proceed even if it would "have no claims to assert" absent a contract. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1110 (D.C. Cir. 2022). And in *Sharp*, the plaintiff alleged his transfer violated both a statute and a contract, and the court found jurisdiction over the former but not the latter claim. *Transohio*, 967 F.2d at 610 ("*Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government."). Those holdings fully apply here.

*Regulations*. A similar analysis applies to Plaintiffs' claim that EPA violated regulations barring EPA from terminating the NCIF and CCIA grants otherwise than in accordance with the grants' conditions.

Again, the Tucker Act cannot preempt jurisdiction here because there is no jurisdiction in the Court of Federal Claims, *United States v. Mitchell*, 463 U.S. 206,

216-18 (1983), including because Plaintiffs do not invoke any "money-mandating requirement." *Son Broadcasting*, 42 Fed. Cl. at 535.

And the claim is just like in *Sharp*. There, the district court could consider whether the plaintiff's transfer "would be contrary to regulations" and enter "an injunction of the transfer," even though there was a separate claim (not subject to district-court jurisdiction) that any transfer violated a contract. 798 F.2d at 1523. Here, too, Plaintiffs' claim based on EPA's regulations may proceed in District Court, irrespective of whether Plaintiffs also hold contractual rights.

**3.** EPA's assertion that the APA's sovereign-immunity waiver does not apply here rests on cases holding that when a plaintiff seeks payment on a contract debt from Treasury, the Tucker Act impliedly displaces the APA waiver. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894-95 (D.C. Cir. 1985). Those cases are rooted in §702's text, which requires the court to assess whether another statute "impliedly forbids the relief which is sought."

But here, as explained, the "relief which is sought" is not money from Treasury. Plaintiffs' requested injunction would not even have the indirect effect of causing Treasury to pay. Instead, Plaintiffs seek an injunction barring unlawful interference with Plaintiffs' funds—requests the Court of Federal Claims cannot grant.

That feature of this case sharply distinguishes it from *DOE*, *Widakuswara*, and EPA's other authorities. In *DOE*, for example, the district court ruled that the agencies acted arbitrarily in terminating grants (the plaintiffs did not press statutory or constitutional claims), and the court "requir[ed] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 145 S.Ct. at 968. The Supreme Court acknowledged that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," but held that a plaintiff cannot rely on the APA's sovereign-immunity waiver to obtain an "order[] 'to enforce a contractual obligation to pay money.'" *Id.* (quoting *Bowen*, 487 U.S. at 910, then *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). *Widakuswara* reached a similar conclusion, holding that plaintiffs there were seeking to mandate specific performance of a contractual payment obligation. 2025 WL 1288817, at *4. Here, by contrast, Plaintiffs seek neither money nor an injunction indirectly requiring EPA to pay, but rather an injunction prohibiting EPA from unlawfully interfering with money Plaintiffs have title to.

EPA maintains (at 22) that "[n]othing in the GGRF statute or EPA's regulations confers any right to payment on plaintiffs independently of the grant contracts." But for all its insistence that Plaintiffs are enforcing a payment obligation

in executory contracts, EPA never points to a single money-mandating provision. That is because Plaintiffs do not invoke one.

To be sure, if Treasury were to illegally direct Citibank to wire funds to Treasury and Citibank were to comply, then Plaintiffs could seek damages. But no precedent requires Plaintiffs to wait for that to occur. When public officials "unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, [the aggrieved party] is not relegated to the Court of Claims to recover a money judgment." *Land*, 330 U.S. at 738. That has also been true where, as here, a plaintiff claims property rights from a government contract. *Ickes*, 300 U.S. at 96-97 (district court may "enjoin the Secretary" from "enforcing an order" that would "deprive respondents of vested property rights").

## B. Plaintiffs Are Likely To Succeed On The Merits.

### 1. The IRA and The Constitution.

The District Court rightly concluded that Plaintiffs are likely to show a violation of the IRA and the Separation of Powers. (The District Court did not reach Plaintiffs' due-process claim, which mirrors the claim in *Sharp*, 798 F.2d at 1521-22, and remains open on remand.)

**a.** The Founders vested Congress with "exclusive power over the federal purse" in the Appropriations Clause, imposing an "important [] restraint on Executive Branch officers" and safeguarding "the Constitution's separation of

powers." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). In the IRA, Congress "appropriated [funds] to the Administrator" of the EPA, "to remain available until September 30, 2024, to make grants, on a competitive basis," to "eligible recipients." 42 U.S.C. §7434(a). Congress instructed EPA to award the grants to "nonprofit organization[s]" that are "designed to provide capital … for the rapid deployment of low- and zero-emission products, technologies, and services," *id.* §7434(c), specifying how "eligible recipients" were to "use the grant," *id.* §7434(b). And Congress directed that, once the programs were running, grantees were to "ensure continued operability" of the grant programs. *Id.*

EPA ran a competitive process, selected grantees satisfying statutory requirements, and obligated the grant funds by the September 30, 2024 deadline, all in accordance with Section 7434(a).

EPA now claims the programs do not align with "the public interest or agency's priorities" and need to be redesigned with the funds re-obligated, Br.1, but it lacks that authority. *In re Aiken County* is on point. 725 F.3d 255, 267 (D.C. Cir. 2013) (Kavanaugh, J.). In each case, Congress appropriated funds for a particular effort (here, making competitive grants; there, assessing applications to store nuclear waste) and set a statutory deadline for an agency to act. *See* 42 U.S.C. §7434; *Aiken Cnty.*, 725 F.3d at 257-58. In *Aiken County*, the agency refused to adhere to the statute due to "policy disagreement[s] with Congress." 725 F.3d at 260. This Court

36

found a constitutional violation. The only difference is that, in *Aiken County*, the Nuclear Regulatory Commission failed to comply from the outset. *Id.* at 258. Here, EPA *met and completed* its obligations—establishing the NCIF and CCIA programs and obligating the associated funds by September 2024—but now seeks to undo those actions, cancel the program, and supposedly redo it after the deadline. *See* JA994-95; *supra* at 9-12. Both versions are unlawful. "Congress sets the policy," and "policy disagreement with Congress's decision[s] … is not a lawful ground for [an agency] to decline to continue [a] congressionally mandated [program]." 725 F.3d at 260.

Consider also *Train v. City of New York*, 420 U.S. 35 (1975). There, Congress appropriated to EPA monies to "be allotted" by EPA "not later" than a deadline. *Id.* at 38-39. For policy reasons, EPA decided to allot "less than the entire amounts authorized"; the Supreme Court held it had no such authority. *Id.* at 41. The Court specifically rejected the argument that EPA could allot funds after the statutory deadline passed. *Id.* at 46-47. The Court also rejected EPA's effort "to imply a power of some sort in the Executive to control outlays under the Act" at the allotment stage: "the power to control [disbursements], such as it was, was to be exercised at the point where funds were obligated." *Id.* at 48.

This case is *a fortiori*: the time to exercise discretion was in the obligation stage—before September 30, 2024. There is no implied statutory authority to claw

back all funds. No implied authority to run a new competitive process. No implied authority to select new grant recipients. And—because the funds revert to Treasury after the appropriations deadline—no ability (let alone implied authority) to obligate funds to new recipients. *See City of Houston v. HUD*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994).

**b.** EPA's first—albeit halfhearted—response is to reduce the Appropriations Clause to a crude prohibition on "attempts to spend funds not appropriated by Congress" or outright "refusal[s] to spend appropriated funds." Br.37. That is irrelevant because EPA's conduct also violates the IRA and the Separation of Powers. And it is wrong because the Appropriations Clause "has a more fundamental and comprehensive purpose"—to "assure that public funds w*ill be spent according to the letter of the difficult judgments reached by Congress* as to the common good." *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990).

In other words, the Executive cannot (1) decline to expend funds Congress appropriated, (2) expend appropriated funds other than as Congress directed, or (3) ignore statutory deadlines for expending funds. *See id.*; *Aiken Cnty.*, 725 F.3d at 260-261 & n.1. In the IRA, Congress directed precisely how the funds were to be spent and by when. "[O]ur constitutional system of separation of powers would be significantly altered if we were to allow [the] executive … to disregard" such directives for policy reasons. *Aiken Cnty.*, 725 F.3d at 267; *Train*, 420 U.S. at 48.

**c.** EPA next asserts Congress empowered it to determine the "overall effectuation of the [IRA's] policy aims," Br.37, and "ensur[e] that [GGRF] program activities are carried out 'as determined appropriate by the Administrator,'" Br.5 (quoting 42 U.S.C. §7434(a)(1)). But EPA's sole statutory authority, §7434(a)(1), is inapposite, and only confirms Plaintiffs' point. That provision authorizes the EPA Administrator to identify "greenhouse gas emission reduction activities" for which grant recipients in a *separate* grant program—Solar For All—might use the $7 billion Congress appropriated under 42 U.S.C. §7434(a)(1). Solar For All is not at issue here; the programs at issue here, NCIF and CCIA, were funded with appropriations from other parts of the statute, namely §7434(a)(2) and (3).[11]

Moreover, that is the statute's *only* reference to discretion, further confirming that EPA's only "control" there "was to be exercised at the point where funds were obligated," and by the statutory deadline. *Train*, 420 U.S. at 48. As the District Court recognized, Congress "laid out specific directives [in the IRA]—not mere suggestions—as to what EPA could do with the money, and it provided specific deadlines and specific requirements for eligible recipients." JA995.

**d.** In the end, EPA asserts (at 39) that its conduct is permissible—and distinct from that in *Aiken County*—because it "intends to re-obligate the funds." That

---

[11] EPA, <u>Frequent Questions about the Fund</u>, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund.

assurance is no help for two reasons. First, as explained, the IRA does not allow a complete do-over. Any effort to re-do these programs based on EPA's new policy priorities, after the statutory deadline, would violate Congress's mandate. And the fact that EPA has certain contract rights does not give it license to dispense with the Constitution. *Maryland*, 763 F.2d at 1449 ("federal grant programs … remain governed by statutory provisions expressing the judgment of Congress").[12]

Second, the District Court found that "the record does indicate that EPA seeks to dismantle these grant programs in their entirety as a policy matter." JA995. The record supports the District Court's finding. From day one, the Administration sought to end climate-related IRA funding, announcing its plan—in executive orders, OMB directives, and other public statements—to "[t]erminate" the so-called "Green New Deal." *Supra* at 9-12. President Trump described NCIF funding as a "flagrant waste of taxpayer dollars" during his March 4 speech to Congress, and Administrator Zeldin repeatedly vowed to "not rest until these hard-earned taxpayer dollars are returned to the U.S. Treasury." JA333. On top of that, just days after announcing that it would review the programs to determine whether additional controls were necessary, EPA instead abruptly terminated both programs. JA993; *see infra* Point I.B.2.a. EPA also apparently caused Citibank to temporarily move

---

[12] As noted above (at 5-6), if any individual grant is terminated for, *e.g.*, violations of the False Claims Act, and if funds are returned, then, per the grants, those would be re-obligated among existing grantees.

CCIA funds into cash accounts, where clawing them back would be easier. *See* JA2076-78.

**e.** Finally, EPA asserts that "plaintiffs' constitutional claims cannot support the injunction entered below," and instead the District Court should "requir[e] EPA to *re-obligate* the grant funds." Br.39. But that remedy would not cure the statutory violation. If EPA dismantled the program, clawed back the funds, and re-obligated them to different recipients under different conditions, it would still be violating Congress's mandate that the grants be awarded by September 2024. Compliance with the statute requires sticking with existing grantees. An order enjoining the terminations is tailored to the violation as it stops EPA from violating Congress's directives by unlawfully dismantling and re-doing the programs.

## 2. Arbitrary-And-Capricious Action and Agency Regulations.

The District Court correctly concluded that EPA acted arbitrarily and capriciously by (1) failing to provide a reasoned explanation for its mid-February freeze and its purported redoing of the NCIF and CCIA programs, and (2) violating its regulations. JA991-95.

**a.** EPA's arbitrary-and-capricious conduct started well before EPA issued the Notices of Termination—i.e., when, without explanation, EPA directed Citibank to freeze Plaintiffs' funds. It continued even after that seizure when, "despite repeated inquiries," EPA offered no explanation, and still does not. JA992. The District Court

held that EPA failed the APA's reasoned-rationale requirement as to the freeze of Plaintiffs' funds "because it did not say *anything* about its decision, for weeks." *Id.*

EPA jumps directly to the Notices of Termination it sent on March 11 to all grant recipients minutes apart, arguing that the Notices adequately explained that its conduct was "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." JA701; Br.33. Plus, the government says, "EPA has identified material deficiencies" in oversight and account controls. JA701; Br.33-34.

But EPA offered *no facts* or individualized reasoning to justify redoing the entire program. JA993. EPA never identified any "fraud, waste, [or] abuse," or impropriety in the award process. And, if EPA "identified material deficiencies" in program oversight, it never explained them. Nor did it explain why the arrangement that EPA itself set up with Citibank to further Congress's objectives was inadequate. Indeed, EPA has never disputed that it has far *more* oversight and transparency at Citibank than if grantees withdrew funds from Treasury. *See supra* 8-9; JA864; JA2149. "[C]onclusory" references to 'material deficiencies' "cannot substitute for a reasoned explanation." *Envt'l Health Tr. v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021); *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (similar); *City of Kansas City*, 923 F.2d at 193-94 (setting aside grant termination as arbitrary).

There is a reason why EPA's explanation is so weak: days before the termination, EPA stated that it *lacked* sufficient information. On March 4, 2025, *after* Administrator Zeldin announced his intent to claw back Plaintiffs' funds, EPA requested information from Plaintiffs by March 28 to help EPA evaluate the program. *E.g.,* JA394. Then, on March 8, EPA advised Citibank of its March 4 information requests, explaining the information was necessary due to the "current lack of critical information" and "*potential* patterns of waste, fraud, or abuse." JA694-95. And, in a March 10 email, EPA reiterated its "concerns regarding *potential* fraud and/or conflicts of interest" and again stated it would evaluate those concerns "based on [Plaintiffs'] incoming responses" due March 28. JA65.

Yet the very next day, March 11, weeks before the March 28 deadline for Plaintiffs' responses, EPA ended both programs entirely. Why? Because Plaintiffs sued, and the District Court scheduled an immediate TRO hearing. EPA then sent boilerplate termination letters to everyone, citing generalized and unsubstantiated concerns it ostensibly sought to evaluate through its requests to Plaintiffs. *Compare* JA393 *with* JA701. That is textbook arbitrariness. *United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983) (agency action is arbitrary and capricious when the agency "fail[s] to examine in an orderly fashion" the necessary information). Meanwhile, Plaintiffs submitted their responses by the March 28 deadline, and EPA has never suggested the responses revealed anything untoward.

On this record, "[i]t [wa]s unclear to the [District Court] what 'relevant data' EPA considered within such a short period that called for the sudden termination of these grants, compelling the court to 'guess at the theory underlying the agency's action.'" JA993 (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196-197 (1947)). And, as the court found, EPA failed to provide any "rational explanation for why it needed to cancel the grants to safeguard taxpayer resources, especially when it had begun examining the grant programs to add oversight mechanisms, or why it needed to cancel *every single grant* to review *some* aspects of the GGRF program." JA993.

In short, there is no "rational connection between the facts found and the choice [EPA] made" to cancel (and assertedly re-do) the programs. *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626 (1986).

**b.** EPA's conduct should also be "set aside as arbitrary and capricious [because] the agency fail[ed] to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

First, EPA violated 2 C.F.R. §200.341(a), which required "written notice of termination" of a federal award that "include[s] the reasons for termination." EPA insists (at 33) that its Notices of Termination satisfied this regulation. That is wrong. Section 200.341(a)'s notice-and-explanation requirements are not satisfied by a letter purporting to terminate federal grant programs, "effective immediately," based on nothing more than "generalized and unsubstantiated reasons," JA992-93. *See*

*supra* Point I.B.2.a.; *Envtl. Health Tr.*, 9 F.4th at 905; *cf. City of Kansas City*, 923 F.2d at 191-93 (enforcing pre-termination statutory notice requirement).

Next, EPA violated 2 C.F.R. §200.340(a)(4), which permits termination only "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Br.32. As the District Court explained, the first clause of §200.340(a)(4) means what it says: an agency "can only terminate a federal award on this basis *pursuant to the terms and conditions of the federal award*." JA994; *see also* 89 Fed. Reg. 55,263 (under the revised §200.340(a)(4), this ground must be "clearly and unambiguously included in terms and conditions of the award"). As explained, that ground *never* appeared in Plaintiffs' awards, *supra* at 5-6. EPA fails to explain how it complied with this regulation.

**C.    Plaintiffs Have Shown Irreparable Harm Absent An Injunction.**

The District Court found that without a preliminary injunction barring EPA's dismantling of the grant program and EPA's interference with Plaintiffs' property, Plaintiffs will suffer irreparable harm that is so "imminen[t] that there is a clear and present need for equitable relief." JA997 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016)). That finding was based on voluminous and unrebutted evidence. EPA has not shown clear error, or established that the

irreparable-harm determination was an abuse of discretion. *See Atlas Air, Inc. v. International Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019).

First, financial injury can be "irreparable" if it "threatens the very existence of the movant's business." JA997 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The District Court correctly credited the unrebutted evidence that multiple Plaintiffs, including Climate United, PFC, Justice Climate Fund, and subgrantees Rewiring Community Investment Fund and ICLEI, cannot cover payroll and will be forced to close their doors for good absent the injunction. JA998-1000 (citing evidence); *e.g.*, JA1000 (citing evidence that Justice Climate Fund "will run out of money to fund its operations in less than 45 days—and possibly much sooner").

Second, the District Court explained that Plaintiffs "demonstrated irreparable harm in damage to their business reputation." JA1000; *accord Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (injury to party's "good name" that could cause "withdrawal" from market). Plaintiffs submitted abundant unrebutted evidence, which the District Court did not clearly err in crediting, that "in this case," the "[r]eputational harm … cannot be overstated, especially given the structure of the NCIF and CCIA programs and Plaintiffs' positions as lenders in the financial markets." JA1000-01 (citing sworn declarations). Plaintiffs are financial entities that depend on their reputations to maintain the support of stakeholders; attract future

grants, investment partners, deal terms, and skilled employees, JA1001 (citing JA384-85 ¶73);[13] and secure government and private funding, JA985 n.4 (citing JA1331 ¶35, JA1474 ¶33).

Third, EPA's conduct will irreparably undermine Congress's core purpose in enacting the GGRF. Congress structured the NCIF to "mobilize and leverage private financing" to "multiply the impact of public funds," and designed the CCIA to provide "specific industry networks" with "access to the capital they need." JA997-98. Thus, the District Court explained, the "very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their grant money." JA997. Without an injunction, the District Court found, it "will be more difficult, if not impossible" for Plaintiffs "to find partners willing to enter into financing arrangements and to find qualified employees willing to work with them" to accomplish Congress's mission. JA1001 (citing JA384-85 ¶73). Projects cannot continue in limbo: without immediate access to funds, these will fall apart, harming the members of the public who stand to benefit. JA998-1000 (cataloguing record evidence); Doc.2112204 ¶¶19-26.

---

[13] Doc.2112204 ¶¶27-32; JA402 ¶¶6-7, JA404 ¶¶11-13; JA427-28 ¶¶7-8, JA430-32 ¶¶18-24, JA411-12 ¶¶16-17, JA414 ¶25; JA456-58 ¶¶20, 26; JA1648 ¶17, JA1654 ¶42; JA1988-89 ¶¶65-67; JA2005 ¶¶5-9; JA1330-31 ¶¶32, 35; JA1474 ¶33; JA1298 ¶21; JA1427 ¶36.

EPA asserts (at 16) that "any alleged financial harms would be remedied by a final judgment awarding them the monetary relief they claim entitlement to." Plaintiffs are not seeking monetary relief, and EPA ignores overwhelming evidence that, without the injunction, any future damages award will be meaningless. Multiple grant recipients and subrecipients will no longer exist, and the injunction is needed to safeguard Plaintiffs' reputations and their ability to attract needed capital and partners. That makes this a situation where, as even EPA recognizes, "[f]inancial injury is … irreparable" because "no 'adequate compensatory or other corrective relief will be available at a later date.'" Br.40 (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).

EPA further asserts (at 16) that "Plaintiffs have not had access to grant funds for nearly two months, yet the parade of irreparable harms they allege has not come to pass." That is incorrect: Plaintiffs submitted unrebutted evidence (credited below) that they suffered irreparable harm. JA998-1000 (cataloguing evidence of irreversible layoffs of key staff, loss of key contractors and service providers, inability to pay bills, imminent risk of loss of necessary office space and insurance, loss of prospective projects, and worsening deal terms); *see also* JA954-58 ¶¶5-16 (describing additional harm since briefing); Doc.2112204 ¶¶9-10, 15, 18, 29-32 (same); Dkt.112 (May 12, 2025 PFC Status Report: PFC and its coalition member, Rewiring America, were forced to lay off employees last week).

EPA also asserts (at 40) that Plaintiffs' harm is "limited" because of "the early stage of these grant programs, which have yet to engender any serious reliance interests." But if a grantee ceases to exist or its projects cannot go forward, it suffers irreparable harm. Regardless, EPA ignores factual findings describing many projects, for hundreds of millions of dollars, that Plaintiffs and subgrantees spent substantial time developing and launching, while incurring substantial expenses, all in reliance on their grants. JA998-1000; Doc.2112204 ¶26.

Finally, the District Court correctly held that "[a]ny transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." JA998. Thus, the restraint on EPA clawing back and re-obligating funds should stand. At a minimum, were this Court to reverse, the Court should leave the administrative stay in place pending potential en banc review.

### D. The Balance Of Equities And Public Interest Favor Plaintiffs.

The District Court did not abuse its discretion in finding that the balance of equities favors Plaintiffs. The District Court stated that it "accord[ed] relevant weight to the government's protection of the public fisc," and that "EPA's interests remain adequately protected" by existing safeguards, while "Plaintiffs face immediate, irreparable harm" without an injunction. JA1002-03.

EPA claims it will suffer "injury to the agency's ability to effectuate Executive Branch policy." Br.40-41. But the funds at issue belong to Plaintiffs, not Treasury,

and "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" JA1002-03. EPA cannot overturn the policy Congress set.

EPA contends the District Court "underappreciated" the "harm to the public fisc" if Plaintiffs deploy grant funds before EPA can "reconstitut[e] the program in a manner that ensures accountability and effective expenditure of taxpayer dollars." Br.40-42. But, as explained, EPA fails to explain what "accountability" measures are missing, and "reconstituting" the program after the September 2024 deadline is barred by statute. *See supra* Point I.B.1.

EPA is also wrong to suggest (at 42) that the injunction "depriv[es] the public fisc of significant interest earned" on Plaintiffs' funds. EPA did not raise this argument below. Regardless, Plaintiffs are entitled to all interest on grant funds as "program income." JA523-24.

Finally, EPA asserts (at 40-41) that it will be unable to recover funds paid to Plaintiffs, including misspent funds. But the funds were already disbursed to Plaintiffs, as Congress intended, and the District Court found (without any clear error identified) that there was no risk of improper expenditures because Plaintiffs "can only use" grant funds "for specific, approved purposes,"[14] and "[t]here are sufficient

---

[14] EPA singles out a $250 million transfer request from Climate United. Br.41. That relates to a commitment announced in October 2024 to purchase battery-electric heavy-duty trucks from U.S. manufacturers. Doc.2112204 ¶¶21, 47. Climate United would receive those funds as part of closeout even if its grant were terminated, as would any other Plaintiff with respect to committed amounts.

protections in place to prevent the type of reckless spending EPA envisions."
JA1002-03; JA372-73 ¶¶33, 35. That includes a Notice of Exclusive Control, which
EPA has not issued.

The public interest favors an injunction because "[t]here is generally no public
interest in the perpetuation of unlawful agency action," while "there is a substantial
public interest in having governmental agencies abide by the federal laws that govern
their existence and operations." JA1003 (quoting *LWV*, 838 F.3d at 12).

## II.   The Court Should Affirm The Preliminary Injunction Against Citibank.

The District Court found that Plaintiffs were likely to succeed on their contract
claim against Citibank and ordered Citibank to comply with accountholder
instructions. JA997. That order should be affirmed.

### A.   Plaintiffs Are Likely to Succeed on Their Claim Against Citibank.

By refusing to honor accountholder instructions, Citibank breached the ACAs.
Under the ACAs, Citibank "shall comply with all instructions, notifications, and
entitlement orders the Bank receives [from accountholders] directing the disposition
of funds and financial assets in the Accounts." JA1145. Citibank may refuse *only* if
the secured party under that ACA (i.e., EPA for grantee ACAs, the respective grantee
for subgrantee ACAs) exercises its secured-party right to issue a Notice of Exclusive
Control. *Id*. That requires "a written determination and finding" that one of the three
exclusive grounds for terminating the grants was triggered. JA1152; *see also* JA1144

("agree[ing] that the terms and conditions … in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control"). No such notice ever issued. Hence, Citibank is required to comply with Plaintiffs' instructions. Because it refuses to do so, Citibank breached the ACAs.

Finding no defense in the plain text of the ACAs, Citibank cites a separate agreement to which Plaintiffs are not parties, the FAA, and contends that the ACAs contain an *implied* exception permitting it to refuse Plaintiffs' disbursement requests when necessary to comply with the FAA. Br.8. That is wrong. Section 9 of the ACA states that it "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." JA1148; *see also* JA1146 (each party "acknowledges and agrees" that Citibank's "duties, responsibilities and obligations … shall be limited to those expressly set forth in" the ACAs). That leaves no room for implied exceptions. Under New York law (which governs), "where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013).

Citibank insists upon reading the ACAs "in conjunction with" the FAA, citing cases holding that interrelated agreements should be "read together." Br.8. But those concern multiple contemporaneous agreements signed by the *same parties*. *Id*. Here,

Plaintiffs never signed the FAA. No case holds that an agreement a party *did* sign should be narrowed by another agreement the party *did not* sign. Regardless, there is no circumstance in which the FAA requires breaching the ACAs. Indeed, the FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts" at EPA's direction *only* "in accordance with the account control agreements." JA2148. Similarly, in the event of "termination," the FAA instructs Citibank to take direction from EPA "in accordance with the account control agreements." *Id.* Thus, the natural reading of the FAA is to require Citibank's compliance with the ACAs.

Citibank nonetheless insists it was fulfilling its FAA obligation to "comply with all lawful instructions or directions received from Treasury." Br.10; *see* JA2129. But Citibank began freezing funds weeks *before* Treasury sent any "instruction," based on FBI "recommendations." JA99-101. Treasury eventually did send instructions to Citibank—but as the District Court correctly concluded, "the instructions [Citibank] received were not lawful." JA996.

Strikingly, neither Citibank nor EPA defends the legality of Treasury's instruction. Instead, Citibank contends (at 11) that it could not second-guess Treasury, and that the ACAs instruct Citibank should "not incur any liability" due to "any act of any governmental authority." But Plaintiffs are not seeking to hold Citibank *liable*. They are not seeking damages at all. They seek forward-looking relief mandating Citibank's compliance with accountholder instructions. Even if

Citibank was reluctant to decide *on its own* whether Treasury's instructions were lawful, the *District Court* was surely authorized to do so, and it did.[15]

## B. Citibank's Sovereign-Immunity Defense Fails.

Citibank argues that if the Court sends Plaintiffs' claims against EPA to the Court of Federal Claims, it should dismiss or stay Plaintiffs' claims against Citibank. Citibank is wrong, even if Plaintiffs cannot proceed against EPA here.

**1.** If EPA is dismissed from this case, there would be no basis for dismissing Citibank. The District Court—not the Court of Federal Claims—has jurisdiction over Plaintiffs' claims against Citibank, so the District Court was obligated to adjudicate them. Courts "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Zukerman v. USPS*, 961 F.3d 431, 445 (D.C. Cir. 2020).[16]

Citibank invokes "derivative sovereign immunity." But even assuming EPA is immune (it is not), that doctrine does not apply here. In Citibank's cases, the plaintiff sued a government contractor for money damages, and the court granted the contractor the same immunity as the United States would possess. *E.g.*, *In re OPM Data Sec. Breach Litig.,* 928 F.3d 42, 68-71 (D.C. Cir. 2019); *see also Yearsley v.*

---

[15] Although Citibank is a fiduciary (Br.10-11), that is no defense to a suit on a contract Citibank signed in its own name. Restatement (Third) Agency §7.02.

[16] As Citibank acknowledges (Br.2), Plaintiffs and Citibank are diverse.

*W.A. Ross Constr. Co.*, 309 U.S. 18 (1940). This case is nothing like that. EPA urges the Court to decline jurisdiction here because, it claims, the Tucker Act "grants consent to suit" elsewhere, 5 U.S.C. §702—i.e., in a different forum. Citibank, by contrast, cannot be sued under the Tucker Act, as Citibank touts (at 13-14). Thus, Citibank is not seeking "derivative" immunity, but immunity *broader* than EPA's— immunity from suit *everywhere*.

Moreover, this Court has rejected a sovereign-immunity argument (like Citibank's) based on a contract defense that—if raised directly—could be litigated solely in the Court of Federal Claims. In *Megapulse*, as noted above, the plaintiff sought to enjoin the Coast Guard's release of its trade secrets. 672 F.2d at 969. In defense, the Coast Guard raised a license under a government contract, and argued plaintiff's claims belonged in the Court of Federal Claims. *Id.* This Court disagreed, explaining that it was "not at all unusual for a court to find it necessary in the course of deciding a dispute over which it does have jurisdiction to decide an issue which would be outside its jurisdiction if raised directly." *Id.* at 968-69.

The same reasoning applies here. The Court has jurisdiction over Plaintiffs' claims against Citibank. Citibank cannot avoid jurisdiction by raising a defense based on a contract it signed with Treasury (one Plaintiffs did not sign). The District Court appropriately resolved Citibank's "lawful instructions" defense. *Id.*

**2.** Citibank alternatively requests that this Court direct the District Court to stay Plaintiffs' claims against Citibank. That request, too, should be rejected. Plaintiffs are seeking access to their property in Citibank accounts. They should not be denied a hearing based on hypothetical parallel proceedings against a third-party. Worse, if the Court enters a stay, EPA threatens to illegally direct Citibank to wire funds to Treasury, Citibank will apparently comply, and then—post-stay—Citibank will argue mootness. The Court should not deny relief in this way and, at minimum, should maintain the injunction barring Citibank from transferring funds to Treasury.

Further, contrary to Citibank's suggestion, this case would not "parallel" any Court of Federal Claims case. Citibank's defense is that Citibank's breach was excused by the FAA. Plaintiffs are not parties to the FAA, cannot sue for breach of the FAA, and would not bring any overlapping claim in any hypothetical case in the Court of Federal Claims. The Court should not stay Plaintiffs' contract claims against Citibank so that Plaintiffs can litigate different issues against a different party in a different forum. It should permit Plaintiffs to vindicate their rights here and now.

## CONCLUSION

The Court should affirm.

Dated: May 12, 2025

Respectfully submitted,

/s/ *Vincent Levy*
  Vincent Levy
    *Counsel of Record*
  Kevin D. Benish

 /s/ *Adam G. Unikowsky*
  Adam G. Unikowsky
    *Counsel of Record*
  Kathryn L. Wynbrand

Daniel Fahrenthold
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellee*
*Coalition for Green Capital*

/s/ *Beth C. Neitzel*
Beth C. Neitzel
   *Counsel of Record*
Jack C. Smith
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw
James M. Gross
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee Power*
*Forward Communities*

/s/ *David J. Zimmer*
David J. Zimmer
   *Counsel of Record*
ZIMMER, CITRON & CLARKE LLP

David B. Robbins
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com

Allison N. Douglis
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff-Appellee Climate*
*United Fund*

/s/ *Jay C. Johnson*
Jay C. Johnson
   *Counsel of Record*
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel.: (202) 344-4000
jcjohnson@venable.com

*Attorney for Plaintiff-Appellee Inclusiv,*
*Inc.*

130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Attorneys for Plaintiff-Appellee*
*Justice Climate Fund*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the preceding motion complies with the type-volume limitation of the rules, containing 12,994 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). I further certify that the document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Vincent Levy*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Vincent Levy*